## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

**In re FANNIE MAE 2008 SECURITIES**        **No. 08-CV-07831-PAC**
**LITIGATION**        **MDL No. 2013**

_____

**COMPREHENSIVE INVESTMENT**
**SERVICES, INC.**

                **Plaintiff,**        **No. 09-CV-06102-PAC**

    **-vs-**

**FANNIE MAE, DANIEL H. MUDD,**
**ROBERT J. LEVIN, STEPHEN M. SWAD**
**ENRICO DALLAVECCHIA,**
**CITIGROUP GLOBAL MARKETS, INC.,**
**and WACHOVIA CAPITAL MARKETS, LLC.,**

                **Defendants.**
_____

## FIRST AMENDED COMPLAINT

## Table of Contents

I. PARTIES ........................................................................................................... 4

    A.   Comprehensive Investment Services, Inc. ............................................. 4

    B.   Federal National Mortgage Association ................................................ 4

    C.   Underwriter Defendants ....................................................................... 5

    D.   Officer Defendants .............................................................................. 5

II. JURISDICTION AND VENUE ........................................................................ 6

III. OVERVIEW ..................................................................................................... 7

IV. FACTS ............................................................................................................. 9

    A.   Fannie Mae In Brief –The "Worst Run Financial Institution" ............... 9

    B.   The Growing Subprime Market ........................................................... 12

        1.   The Mortgage Market: Creative Financing ................................... 12

        2.   Classifications of Mortgage Loans: Prime Loans vs. Risky Loans ......................... 13

            a.   Prime Mortgage Loans ........................................................... 14

            b.   Risky Subprime Mortgage Loans ........................................... 14

            c.   Risky Alt-A Mortgage Loans ................................................. 15

    C.   Fannie Mae's  Exposure to Risky Subprime and Alt-A Mortgages ....... 15

        1.   Fannie Mae Ramps Up its Involvement in Subprime and Alt-A Mortgages.......... 16

        2.   Fannie Mae Conceals Risk Exposure ........................................... 20

    D.   Fannie Mae's Capital Base ................................................................. 22

        1.   Deferred Tax Assets .................................................................... 22

        2.   Failure to Write Down Other-Than-Temporary Impairments .......... 26

        3.   Insufficient Loss Reserves ........................................................... 28

        4.   Weak Risk-Based Capital ............................................................ 29

        5.   The Reality of Fannie Mae's Financial Position........................... 36

    E.   Fannie Mae's Risk Management Failures ........................................... 39

    F. Fannie Mae Misrepresents Risks..................................................... 43

    G. The Materially False and Misleading Offering Circular ................... 52

V. UNDERWRITER DEFENDANTS ................................................................. 55

**VI. OFFICER DEFENDANTS' SCIENTER** ........................................................................... 63

    **A.  Mudd** ...................................................................................................................... 66

    **B.  Levin** ...................................................................................................................... 67

    **C.  Swad** ...................................................................................................................... 68

    **D. Dallavecchia** ......................................................................................................... 68

**VII. LOSS CAUSATION** ................................................................................................... 70

**VIII. CAUSES OF ACTION** ............................................................................................. 72

    **A. Statutory Fraud** ..................................................................................................... 73

        **1.**    **Primary Violations of Statutory Fraud** ................................................. 73

        **2.**    **Statutory Fraud Aiding & Abetting** ..................................................... 74

    **B.  Texas Securities Act** ............................................................................................. 76

        **1.**    **Primary Violations of the Texas Security Act** ...................................... 76

        **2.**    **Texas Securities Act Control Persons** ................................................... 77

        **3**.    **Texas Securities Act Aiding & Abetting** .............................................. 78

    **C.  Common Law Fraud** ............................................................................................ 80

    **D.  Negligent Misrepresentation** .............................................................................. 81

    **E.  Violation of Section 10(b) of the Exchange Act** ................................................ 82

    **F.  Violation of Sction 20(a) of the Exchange Act** .................................................. 85

**X. PRAYER** ....................................................................................................................... 86

**CERTIFICATE OF SERVICE** ….....……………………………………….……….…....……87

## FIRST AMENDED COMPLAINT

Plaintiff Comprehensive Investment Services, Inc. ("CIS" or "Plaintiff") files this First Amended Complaint against Daniel H. Mudd, Robert J. Levin, Stephen M. Swad, Enrico Dallavecchia, Federal National Mortgage Association, Wachovia Capital Markets, LLC, and Citigroup Global Markets, Inc.

## I.
## PARTIES

**A.    Comprehensive Investment Services, Inc.**

1.     Plaintiff CIS is a Nevada corporation with its principal place of business in League City, Texas.   CIS is a wholly owned subsidiary of American National Insurance Company.

**B.    Federal National Mortgage Association**

2.     Defendant Federal National Mortgage Association ("Fannie Mae") is a government-sponsored enterprise ("GSE") chartered by Congress, with its principal place of business located at 3900 Wisconsin Avenue NW, Washington, D.C. 20016-2892.  Fannie Mae may be served with process upon its attorney, Mike Walsh, O'Melveny & Myers LLP 1625 Eye Street, N.W. Washington, D.C. 20006-4001.   Fannie is owned by the shareholders, and its equity securities were listed and traded on the NYSE during the relevant period. Fannie Mae operates in the U.S. secondary mortgage market by providing funds to mortgage lenders through the purchase of mortgages and mortgage-related securities. Fannie also issues and guarantees mortgage-related securities.  On May 13, 2008 Fannie Mae issued, and Plaintiff purchased, 8.25% non-cumulative preferred stock, Series T, which forms the basis of this lawsuit (the "Preferred Stock").

### C.   Underwriter Defendants

3.      Defendant Citigroup Global Markets, Inc. ("Citigroup"), incorporated in New York, is a subsidiary of Citigroup Inc., a financial services institution that provides commercial and investment banking services to corporate entities.  Citigroup underwrote the Preferred Stock.

4.      Defendant Wachovia Capital Markets, LLC, incorporated in Delaware, is a financial services institution that provides commercial and investment banking services to corporate entities.  Wachovia Capital Markets, LLC underwrote the Preferred Stock and its affiliate broker/dealer acted as a common business enterprise, and is referred to herein as "Wachovia Securities." Wachovia Securities is a Wells Fargo Stock Company and today goes by the name Wells Fargo Securities LLC.

5.      Defendants Citigroup and Wachovia Securities are herein collectively referred to as the "Underwriter Defendants".

### D.   Officer Defendants

6.      Defendant Daniel H. Mudd ("Mudd") was Fannie Mae's President and Chief Executive Officer from June 2005 to September 2008.  Mudd was also Fannie Mae's Vice Chairman of the Board from February 2000 to June 2005, Interim Chief Executive Officer from December 2004 to June 2005 and Chief Operating Officer from February 2000 to December 2004.

7.      Defendant Robert J. Levin ("Levin") was Fannie Mae's Executive Vice President and Chief Business Officer from November 2005 to September 2008.  Levin was Fannie Mae's Interim Chief Financial Officer from December 2004 to January 2006, Executive Vice President of Housing and Community Development from June 1998 to December 2004 and Executive Vice President-Marketing from June 1990 to June 1998.

8.     Defendant Stephen M. Swad ("Swad") was Fannie Mae's Executive Vice President from May 2007 to September 2008.  Swad was also Fannie Mae's Chief Financial Officer from August 2007 to September 2008.

9.     Defendant Enrico Dallavecchia ("Dallavecchia") was Fannie Mae's Executive Vice President and Chief Risk Officer from July 2006 until January 2009.  Dallavecchia also chaired the Allowance for Loan Losses Oversight Committee during his term as Chief Risk Officer.

10.     Mudd, Levin, Swad, and Dallavecchia are herein collectively referred to as "Officer Defendants".

## II. <u>JURISDICTION AND VENUE</u>

11.     This Court has jurisdiction under the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332, section 27 of the Exchange Act, 15 U.S.C. § 78aa. This action arises under the laws of the United States and involves federal questions.

12.     Venue is proper in the Southern District of Texas pursuant to the federal securities laws asserted by Plaintiff and pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in Galveston County, Texas.  The action was transferred to this Court pursuant to the Rules of Procedure of the Judicial Panel on Multidistrict Legislation adopted under 28 U.S.C. § 1407 and is consolidated in the Southern District of New York for pre-trial purposes only. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

13.     The Court has personal jurisdiction over all Defendants in connection with the acts alleged in this complaint.   Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.   All Defendants are residents of the United States and have availed themselves of the federal securities laws and the laws of the State of Texas.   The Court has jurisdiction over the parties and subject matter of this cause, and has jurisdiction to grant all relief requested by Plaintiff.

**III.**
**OVERVIEW**

14.     In May 2008, Plaintiff purchased 600,000 shares of the Preferred Stock for $15 million.   The prospectus for the Preferred Stock (the "Offering Circular") was dated May 13, 2008 and specified an issue date of May 19, 2008.

15.     Plaintiff purchased the Preferred Stock from Wachovia Securities.

16.     Not long after Plaintiff purchased the Preferred Stock, its value took a nosedive. The shares are now worthless on the open market.

17.     Unknown to Plaintiff at the time it purchased the Preferred Stock, the Officer Defendants had, for a substantial period of time, secretly directed Fannie Mae to engage in high-risk transactions. In 2006, the Officer Defendants made numerous public statements assuring the public that all accounting issues from previous accounting scandals had been resolved and that Fannie Mae's financial statements honestly represented Fannie Mae's true financial condition.

18.     Each Officer Defendant deceived the investing public in numerous ways.   The Officer Defendants continuously made deceptive and misleading public statements in press releases and during conference calls with investors.   Each Officer Defendant knew or should have known, but failed to reveal, the absence of adequate risk controls.   The Officer Defendants

7

caused Fannie Mae's financial statements to be materially false and misleading.  Included in the false financial statements are Fannie Mae's 2007 10-K and 2008 First Quarter 10-Q which were referenced in the Offering Circular.   The Officer Defendants approved and/or assisted in preparing both the financial statements and the Offering Circular for filing with the SEC.  As a result of each Officer Defendant's wrongful and illegal conduct, each is liable to Plaintiff under state and/or federal law.  Fannie Mae also made numerous actionable misrepresentations and omissions of material fact.

19.     The Underwriter Defendants were responsible for performing due diligence and placing the Offering Circular for dissemination to the investing public. The Underwriter Defendants were aware, at the time of the offering, of Fannie Mae's prior accounting problems and ignored the numerous red flags that minimal due diligence would have revealed.

20.     According to the Offering Circular, the Underwriting Defendants collectively received between $53.128 million and $63 million in fees for performing underwriting functions.  In other words, the Underwriter Defendants benefited substantially from failing to perform due diligence and placing the Preferred Stock.  Further, the Underwriter Defendants actively solicited Plaintiff and sold the Preferred Stock to Plaintiff all the while misrepresenting Fannie Mae's true financial condition.  The Offering Circular approved by the Underwriter Defendants contained actionable misrepresentations and actionable omissions of material fact.

21.     This suit arises out of Defendants' wrongful acts and omissions in connection with the sale of the Preferred Stock to Plaintiff.

## IV.
## FACTS

**A.      Fannie Mae in Brief –The "Worst Run Financial Institution"**

22.      Fannie Mae, although shareholder owned, is a GSE.  According to the Offering Circular used to solicit Plaintiff's purchase of Preferred Stock, Fannie Mae is a "federally chartered and stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act, 12 U.S.C. § 1716 et seq."

23.      Fannie Mae was established in 1938 to provide stability and liquidity to the mortgage market and became a stockholder-owned and privately managed corporation in 1968. Fannie Mae operates in the secondary market securitizing mortgage loans into mortgage-backed securities and other mortgage-related securities.  Fannie Mae also purchases mortgage loans for its mortgage portfolio.  One of Fannie Mae's primary responsibilities is to manage and liquidate federally owned mortgage portfolios in an orderly manner, with minimum adverse effects on the residential mortgage market and minimal loss to the federal government

24.      In 2004 Fannie Mae was investigated for irregular accounting practices.

25.      Between 2005 and 2008, Fannie Mae purchased or guaranteed hundreds of billions of dollars in loans to borrowers who were viewed by the lending industry as risky. "Fannie Mae went from being the watchdog of credit standards and thoughtful innovators to the leader in default prone loans and poorly designed products."[1]  While Fannie Mae increased its exposure to risk, its capital base became more and more nebulous.  Fannie Mae was a financial house of cards.

26.      On March 7, 2008, apparently in an effort to continue its scheme to purchase yet more risky debts, Mudd proposed a deal to the Undersecretary for Domestic Finance at the

---

[1] Pinto, Edward J., "Statement of Edward J Pinto Before the Committee on Oversight and Government Reform United States House of Representatives," December 9, 2008.

Treasury Department wherein Fannie Mae would agree to raise new capital, if the Office of Federal Housing Enterprise Oversight ("OFHEO")[2] would lower Fannie Mae's portfolio cap.  A similar deal was proposed for Federal Home Loan Mortgage Corporations ("Freddie Mac").  In an earlier letter to shareholders in Fannie Mae's 2007 Annual Report, Mudd said that through decreased capital requirements, Fannie Mae could pay less for loans and allow an increase in shareholder returns.  The OFHEO agreed to lower the capital requirements and Fannie Mae and Freddie Mac said they would begin the process of raising more capital.[3]  However, in what would be a telling turn of events, while Fannie Mae did go to the market to raise more capital, Freddie Mac did not.[4]  Specifically, Fannie Mae's method of raising new capital was to issue the Preferred Stock, which Plaintiff purchased.  Freddie Mac did not issue any similar stock offerings.  James Lockhart, the director of OFHEO, would later speculate that Freddie Mac did not raise additional capital because of the threat of lawsuits.[5]  Lockhart said that "[Syron, CEO of Freddie Mac] was getting advice from attorneys about the high risks of raising capital before releasing [quarterly earnings] … and our lawyers could not disagree because we know about their accounting issues."[6] Fannie Mae apparently had no such reservations, the Offering Circular was distributed to would be investors, and the Plaintiffs bought the Preferred Stocks.

27.     In July of 2008, less than 90 days after the issuance of the Offering Circular and Plaintiff's purchase of the Preferred Stock, Fannie Mae ran out of capital.  Fannie Mae's common stock plummeted to less than $7 a share.  On July 30, 2008, the newly passed Housing

---

[2] OFHEO is an agency within the Department of Housing and Urban Development charged with ensuring the capital adequacy and financial safety and soundness of Fannie Mae. *See* Neil Adler, *Lifting Portfolio Cap Could Hurt Fannie, Freddie*, Washington Business Journal (October 5, 2007).
[3] "OFHELO, *Fannie Mae and Freddie Mac Announce Initiative to Increase Mortgage Market Liquidity*," OFHEO news release, March 19, 2008.
[4] Financial Crisis Inquiry Report – Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States, Submitted by the Financial Crisis Inquiry Commission, Pursuant to Public Law 111-21, January, 2011, (the "FCIC Report") pg. 315.
[5] *Id.*
[6] *Id.*

and Economic Recovery Act dissolved OFHEO and gave new powers to the Federal Reserve (the "FED") and the Office of the Comptroller of the Currency ("OCC") to regulate Fannie Mae. The FED and the OCC undertook a review of Fannie Mae in conjunction with the Financial Crisis Inquiry Commission, created pursuant to Public Law 111-21, and it was discovered that Fannie Mae's financial condition was "worse than their suspicions had led them to believe."[7] The examiner for the FED testified that Fannie Mae's operations were "unsafe and unsound." The OCC rejected Fannie Mae's forecasting methodologies.[8]  Using its own metrics, the OCC found insufficient reserves for future losses and identified significant problems in credit and risk management.[9]  The OCC issued a report in August of 2008 and stated that "given the role of GSEs and their market dominance, they should be industry leaders with respect to effective and proactive risk management, productive analysis, and comprehensive reporting.  Instead they appear to significantly lag the industry in all respects."[10]  On September 7, 2008, Congress, after reviewing Fannie Mae's financial condition, determined that Fannie Mae was no longer in a position to accomplish the task for which it was created.  In a letter sent to Mudd around the same time, the Federal Housing Finance Agency said that Fannie Mae was being placed into conservatorship because of numerous concerns, including "imprudent decisions" made by Fannie Mae's management and board and the "critical unsafe and unsound practices and conditions that gave rise to the Enterprises' existing condition, the deterioration in overall asset quality and significant earnings losses experienced through June 2008 as well as forecasted future losses."[11] Fannie Mae was deemed to be "the worst run financial institution" that the government examiner

---

[7] FCIC Report pg. 317.
[8] FCIC Report, pg. 317
[9] FCIC Report,  pg. 317
[10] FCIC Report, pgs. 317-318
[11] FCIC Report, pg. 318

had seen in 30 years as a bank regular.[12]   Congress placed the company in conservatorship – to be run by the Federal Housing Finance Agency.[13]   Fannie Mae's top executives were ousted and replaced.[14]   The Plaintiffs were left with the practically worthless Preferred Stocks.

## B.   The Growing Subprime Market

### 1.   The Mortgage Market: Creative Financing

28.   In the 1990's and early 2000's, the United States real estate market boomed due to rising home values and low interest rates on mortgages. As a result, more Americans sought financing for homeownership.   Lenders competed for potential borrowers by lowering credit standards and offering alternative mortgage products to people who would not have otherwise qualified for a traditional loan.

29.   Alternative mortgage products included:

(a)   No-documentation and low-documentation loans:  Known in the industry as "liar loans," these loans involve practice of requiring little or no documentation from the borrower.

(b)   Piggy-back loans:  These combine a mortgage with a home-equity loan or line of credit, allowing borrowers to finance more than 80 percent of the home's value without paying for private mortgage insurance.

(c)   Interest-only mortgages:  These allow borrowers to pay only interest in the loan's early years, which keep payments low for a time, but require that the deferred payment of principal be made in the future through increased monthly or balloon payments.

---

[12] FCIC Report, pg. 321
[13] Mark Jickling, *Fannie Mae and Freddie Mac in Conservatorship*, Congressional Research Service, The Library of Congress, September 15, 2008.
[14] *Id.*

(d)     Option adjustable-mortgages:  These loans, called hybrid ARMs,[15] were

marketed with promotional or "teaser" rates during an introductory period

that later ballooned to much higher rates once the introductory period has

ended.

30.     In addition to the increase in the number of mortgages, including alternative

mortgages, originated, many financial firms securitized mortgages by buying them from the

original lender, pooling them with other mortgages and then selling interests in the underlying

cash flow (the monthly mortgage payments from the borrowers to investors).  This mortgage

securitization practice freed up capital for the original lender so that it could approve more and

more loans, which would be securitized as the cycle repeated again and again.  As lenders

competed for business, and as the types of mortgages pooled during the securitization process

became more and more "creative," the mortgages themselves as well as the bundles of security

interests in their cash flow became increasingly risky.

31.     As all Defendants knew, in the mid to late 2000's, the real estate and mortgage

markets experienced a tremendous downturn initiated and fueled by falling home values, rising

interest rates and the proliferation of high-risk mortgage loans.  As a result, the market

experienced a surge in mortgage defaults, causing increased exposure to losses for financial

institutions like Fannie Mae that were heavily invested in mortgage-backed securities.

**2.     Classifications of Mortgage Loans: Prime Loans vs. Risky Loans**

32.     There are various types of mortgage loan products with a correspondingly varying

degree of risk exposure.  Mortgage loans differ based on factors such as loan rate, payment

options, maturity date and amortization of principal.  When applying for a mortgage loan,

---

[15] "ARM" refers to an "Adjustable Rate Mortgage."

borrowers are generally placed into three major categories based upon the perceived risk that they will default on their loan: Prime, Subprime and Alt-A.

### a.   Prime Mortgage Loans

33.    Prime mortgage loans are of high quality and given to borrowers who are not perceived as likely to default on their loans.  Lenders use the Fair Isaac & Company ("FICO") credit scoring system (in which a borrower is assigned a score ranging from 300 to 850) to determine which borrowers qualify for prime loans.  Generally, a borrower with a FICO score of greater than 620 is considered eligible for a prime loan.  Prime Mortgage borrowers have a good past payment history, are unlikely to have filed bankruptcy or have had a past foreclosure, and have a favorable loan-to-value ratio.

### b.   Risky Subprime Mortgage Loans

34.    Subprime mortgage loans are issued to borrowers with low or deficient credit scores who do not qualify for a loan under conventional credit criteria and are therefore perceived as more likely to default on their loan.  Because of this higher likelihood of default, Subprime loans are riskier than prime loans and subprime borrowers pay higher interest rates set proportionate to the higher credit risk.

35.    Subprime loans began to proliferate due to a confluence of factors including rising home prices, declining incomes, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors as a result of mortgage securitization.[16]

---

[16] Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., Testimony Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate:  *Federal Deposit Insurance Corporation on Mortgage Market Turmoil:  Causes and Consequences*, Mar. 22, 2007.

36.     In 2006, subprime lending amounted to approximately 20 percent of the nation's mortgage lending and approximately 17 percent of homes were purchased subject to subprime mortgages.[17]

### c.     Risky Alt-A Mortgage Loans

37.     Alt-A borrowers generally have a clean credit history but may have some qualities that increase the probability of default and risk to the lender, such as higher loan-to-value and debt-to-income ratios or inadequate documentation of income. In theory, an Alt-A borrower was self-employed, had good cash flow, a higher FICO score and a good credit history but for whatever reason could not validate his income.  In practice this would not always be the case.

38.     Alt-A products were actively marketed to subprime borrowers so that any practical difference between Alt-A and subprime loans was virtually eliminated.  Alt-A loans are often referred to as "liar loans" because no documentation of income was required.  Thus a borrower with a relatively good credit score, but who was otherwise lacking in any ability to provide evidence of assets or income sufficient to pay a mortgage, could hide the fact that they were highly likely to default on their mortgage by getting a "liar loans."

## C.     Fannie Mae's Exposure to Risky Subprime and Alt-A Mortgages

39.     As other lenders began investing in these risky mortgages, Fannie Mae decided to abandon sound practices and follow its competitors so that it could maintain its status as a market leader.  Fannie Mae was faced with the decision to "(1) Stay the course; or (2) Meet the market where the market is."[18]  Fannie Mae, knowing of the risks involved with investing in subprime and Alt-A loans, joined its competitors and became heavily invested in the riskiest part of the real estate market.

---

[17] *Id.*

[18] Confidential Fannie Mae Presentation, *Single Family Guaranty Business Facing Strategic Crossroads*, June 27, 2005.

### 1. Fannie Mae Ramps Up its Involvement in Subprime and Alt-A Mortgages

40.      Shortly after Mudd became Chief Executive Officer in 2004, Fannie Mae's proportionate market share of the mortgage industry dropped dramatically.[19]   Lenders were selling the mortgages to Fannie Mae's competitors.  Fannie Mae did not just "meet the market where the market is" – it launched a campaign to all but corner the market in risky sub-prime and Alt-A loans.  During the course of 2005 to 2008 Fannie Mae became a leader in the mortgage backed securities market that would later sustain catastrophic losses.  The following chart from the New York Times[20] demonstrates the dramatic way that Fannie Mae ramped up its involvement in risky lending to maintain market share:





---

[19] Charles Duhigg, *Pressure to Take More Risk, Fannie Reached Tipping Point*, New York Times (Oct. 4, 2008).
[20] Charles Duhigg, *Pressure to Take More Risk, Fannie Reached Tipping Point*, New York Times (Oct. 4, 2008).

16

41.     In January 2007, Mudd sent a confidential memo to Fannie Mae's Board touting the company's expansion into the subprime market.[21]

42.     Just one month later, Fannie Mae, while recognizing the poor performance of subprime loans, predicted that performance would improve in 2007.  In an effort to increase its market share, Fannie Mae outlined plans to increase its involvement in the subprime mortgage market.[22]

43.     Fannie Mae made plans to specifically target both Alt-A and subprime mortgage loans, with a stated objective to "increase our penetration into subprime."[23]

44.     As the subprime and Alt-A market experienced a downturn, Fannie Mae ignored the signs of a failing real estate market and continued to increase its investment in these risky loans.

45.     On April 17, 2007, Fannie Mae announced to the House Financial Services Committee that it would increase its involvement in the subprime mortgage market by offering expanded programs aimed at borrowers with poor credit histories.[24]  Under the program, Fannie Mae would ease its credit requirements and buy 40-year loans as well as 30-year loans in the secondary market.[25]

46.     On September 12, 2007, Fannie Mae requested a further relaxation of restrictions on its ability to expand its mortgage-related portfolio.[26]

47.     One week later, in response to Fannie Mae's request to increase its stakes in the subprime mortgage sector by buying billions of dollars in subprime mortgages and refinanced

---

[21] David S. Hilzenrath, *Fannie's Perilous Pursuit of Subprime Loans*, Washington Post (August 19, 2008), at D1.
[22] David S. Hilzenrath, *Fannie's Perilous Pursuit of Subprime Loans*, Washington Post (August 19, 2008), at D1.
[23] *Id.*
[24] *See Fannie Mae, Freddie Mac Looks at New Loans*, MSNBC.com (April 17, 2007).
[25] *Id.*
[26] *See* Pete Kasperowicz, *Fannie Mae Renews Pitch to Add Liquidity to Market by Lifting Caps*, Forbes.com (September 12, 2007).

loans for borrowers with lower credit scores, the OFHEO slightly increased the cap on Fannie Mae's portfolio to a 2 percent annual growth rate with no more than a 0.5 percent growth rate per quarter.[27]

48.     Despite numerous warning signs of surges in mortgage defaults, and with no regard to their potential risk exposure, Fannie Mae, in October of 2007, again requested to have the cap on its mortgage-related portfolio loosened to permit it to increase the size of its mortgage-related portfolio.  At the time, OFHEO Director James Lockhart expressed concern about Fannie Mae's attempt to enlarge its portfolio, stating that should the company take on too much risk, it "certainly could affect their financial results."[28]

49.     In response, Fannie Mae stated that "it would be inappropriate to speculate on how increasing their portfolios would affect the company's financial results."[29]

50.     Rather than focus on its exposure to losses, Fannie Mae issued a 2007 Q1-Q3 10-Q Investor Summary which stated it would seek to have the restrictions on its mortgage-related portfolio lifted, claiming that it was in a good financial position and thus should be relieved from its capital surplus requirement and portfolio cap.

51.     Fannie Mae continued to increase its exposure to risk when on May 16, 2008 it announced that it was lowering, on a nationwide basis, the amount of required down payments on mortgages it purchased - meaning that it would purchase loans with higher loan-to-value ratios.[30]

---

[27] *See* Neil Adler, *Lifting Portfolio Cap Could Hurt Fannie, Freddie*, Washington Business Journal (October 5, 2007).
[28] *Id*.
[29] *Id*.
[30] News Release from Fannie Mae: Fannie Mae Announces Single National Down Payment Policy; Replaces Policy Regarding Markets Where Home Prices are Declining, (May 16, 2008).

52.     By July 2008, Fannie Mae had an extremely high proportion of Alt-A and subprime mortgages, both on its books and in the mortgage backed securities portfolios it guaranteed. Of Fannie Mae's $2.2 trillion in loans and guarantees, $396 billion, or a whopping 18%, were Alt-A or subprime.[31]

53.     Fannie Mae and Freddie Mac together ended up with about half of the $3 trillion world-wide exposure to subprime and Alt-A losses.[32]  Furthermore, Fannie Mae stayed in the market long after the mid-2006 downturn when other lenders were exiting.   Originators of subprime and Alt-A mortgages knew that Fannie Mae would buy their poorly underwritten instruments.   Indeed, Fannie Mae legitimized these originators (like IndyMac Federal Bank ("IndyMac") and Countrywide Financial Corp. ("Countrywide") and their unsound underwriting practices and gave assurance that there was a source of demand for these products.[33]

54.     Edward Pinto ("Pinto"), Fannie Mae's Chief Credit Officer from 1987-1989, in testimony before the United States House of Representatives Committee on Oversight and Government Reform on December 9, 2008, stated that Fannie Mae and Freddie Mac's subprime and Alt-A[34] holdings comprised over a third of their respective risk portfolios and those loans were experiencing a default rate eight times higher than the GSEs' traditional quality loans. Together, the companies held 34 percent of all outstanding subprime loans and 60 percent of all outstanding Alt-A loans.[35] Fannie Mae alone held approximately 20 percent of all outstanding subprime loans and 30 percent of all outstanding Alt-A loans.[36]

---

[31] Joe Specht, *Fannie Mae – or May Not*, Seeking Alpha.com (July 11, 2008).
[32] Statement of Charles W. Calomiris, United States House of Representatives Committee on Oversight and Government reform, December 9, 2008.
[33] *Id.*
[34] Although Alt-A loans are generally not classified as subprime because the FICO score of the borrower is generally above 660, these loans defaulted at rates approaching those of subprime loans.
[35] Pinto, Edward J., "Statement of Edward J Pinto Before the Committee on Oversight and Government Reform United States House of Representatives," December 9, 2008.
[36] *Id.*

## 2. Fannie Mae Conceals Risk Exposure

55.     Notwithstanding the enormous proportions of Fannie Mae's risky mortgage holdings, Fannie Mae downplayed their numbers and, indeed, continued to use databases and tracking tools that literally concealed or mischaracterized its risky mortgage assets.  This was material since, because Fannie Mae bore the risk for any loans it purchased and held, a surge in mortgage defaults, which are inherently more likely in these risky loans, would result in a huge exposure to Fannie Mae.

56.     Fannie Mae reported in its 2007 10-K that it had total assets of $882 billion and Alt-A and subprime exposure of $405 billion.  Fannie Mae's subprime and Alt-A loans were equivalent to 45% of its total assets.  Simply put, Fannie Mae put most of its eggs in one very risky basket.  However, this is not what Fannie Mae told the investing public.

57.     On a December 11, 2006 conference call, Peter Niculescu, Fannie Mae's Executive Vice President for Capital Markets mentioned that securities in Fannie Mae's Portfolio included "some Alt-A."

58.     On a February 27, 2007 conference call, Mudd was asked about Alt-A loans to which Mudd responded, "we don't have so much that this is a major, significant exposure on our books."

59.     On a November 9, 2007 conference call, Dallavechia said Fannie Mae had a "very small amount of subprime loans."

60.     In truth, this "very small number" of subprime loans amounted to, as stated above, 45% of Fannie Mae's entire asset base.

61.     To make matters worse, many loans purchased or securitized by Fannie Mae were included in the company's prime loan databases, even though 34 percent of these loans should have been classified as subprime, Alt-A or other non-prime loans.[37]

62.     Pinto stated in his testimony to Congress:

> For historical reasons, these loans are also carried in databases as prime loans when they were purchased by Fannie and Freddie, which conveniently allowed them to deny that they were active in the subprime market.  This created tremendous disclosure problems for the industry, since a massive portion of subprime, Alt-A mortgages and other non-prime lending has long been hidden behind Fannie and Freddie's "prime" façade.  Accordingly, there are many more subprime and Alt-A mortgages outstanding today than many people suppose, because half of all these loans are held or securitized by Fannie and Freddie and yet are carried in many databases as prime loans.[38]

63.     Fannie Mae, Officer Defendants nor the Underwriter Defendants ever notified the Plaintiff of the "Prime facade" before it purchased Fannie Mae securities.

64.     According to Pinto's testimony, Fannie Mae reported 0.24 million subprime loans, but maintained an additional 3.05 million loans it listed as prime despite the fact that the borrowers had FICO scores of less than 660 – which would indicate a subprime designation.[39]

65.     Charles Calomiris, the Henry Kaufman Professor of Financial Institutions at Columbia Business School, in testimony before the United States House of Representatives Committee on Oversight and Government Reform on December 9, 2008, stated that Fannie Mae did not disclose the extent of its subprime and Alt-A exposure and noted that most market observers had no idea of the extent of Fannie Mae's exposures until recently.[40]

66.     Moreover, on July 9, 2008, *Bloomberg* reported that, "Credit-default swaps tied to $1.45 trillion of debt sold by the two biggest U.S. mortgage-finance companies are trading at

---

[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] Calamoris, Charles W., "Statement Before the Committee on Oversight and Governmnent Reform, United States House of Representatives," December 9, 2008.

levels that imply the bonds should be rated A2 by Moody's Investors Service."[41]   Derivative traders began to overlook the government's implied guarantee of Fannie Mae's debt as credit losses grew and concern rose that Fannie Mae would not have enough capital to weather the housing slump.[42]

## D.     Fannie Mae's Capital Base

67.     As Fannie Mae dove head first into the risky mortgage market, it boasted that its strong capital base exceed minimum capital requirements. Purchasers of Fannie Mae securities believed and relied on Fannie Mae when it said its capital base was strong and invested $15 million in the Preferred Stock.  The reality, however, was that Fannie Mae's capital consisted of nebulous assets such as deferred tax assets, "other than" temporary impairments, and low loan reserves.  Fannie Mae's capital did not consist of "actual cash that could be used in a crisis."[43]

### 1.     Deferred Tax Assets

68.     Fannie Mae's capital base consisted in large part of deferred tax assets, which are assets whose value can only be recognized if the company posted profits in future quarters.

69.     Under Financial Accounting Standard No. 109 ("FAS 109"), a deferred tax asset is recognized for temporary differences that will result in deductible amounts in future years and for carry-forwards.  For example, a temporary difference is created between the reported amount and the tax basis of a liability for estimated expenses if, for tax purposes, those estimated expenses are not deductible until a future year. Settlement of that liability will result in tax deductions in future years, and a deferred tax asset is recognized in the current year for the reduction in taxes payable in future years.

---

[41] *See* Shannon D. Harrington and Dawn Kopecki, Fannie, Freddie Downgraded by Derivatives Traders, Bloomberg.com (July 9, 2008).
[42] *Id.*
[43] *See* Dawn Kopeck: and Jody Shenn, Fannie Mae to Reduce Value of Deferred Tax Assets, Bloomberg.com (October 29, 2008).

70.     A valuation allowance is recognized if, based on the weight of available evidence, it is more likely than not that some portion or all of the deferred tax asset will not be realized.[44]

71.     In determining whether to report deferred tax assets, a company has to consider both positive and negative evidence regarding whether it will post profits in the future and generate sufficient future taxable income for applying the credits.[45]  In making its determination, a company should consider the existence of cumulative losses in recent fiscal years, its operating results history, adverse unsettled circumstances and forecasted future taxable income.

72.     Deferred tax assets do not have value unless a company generates a profit.  The public and its investors were deceived into believing Fannie Mae's capital base was nearly two times greater than the actual capital base.

73.     Fannie Mae reported a series of quarterly losses, had a huge investment in the failing real estate market and predicted a 50% drop in housing prices over a three to five year period.  The company, however, continued to report increased deferred assets with every quarter that led Plaintiff and other investors to believe that Fannie Mae remained financially healthy.

74.     In the third quarter 10-Q of 2007, Fannie Mae recorded net losses of $1.52 billion dollars.  Losses increased to $3.6 billion in the fourth quarter.

75.     Fannie Mae continued to recognize substantial losses in 2008.  The company recorded $2.2 billion in losses in the first quarter 10-Q, $2.3 billion in the second quarter 10-Q, and a shocking $29 billion loss in the third quarter 10-Q of 2008.

76.     Even though Fannie Mae had not recognized a profit in several quarters and losses continued, Fannie Mae increased its risky strategy by reporting deferred tax assets throughout 2007 and 2008.  These inflated assets deceived Plaintiff and other investors.

---

[44] *See* FAS 109.
[45] *Id*. at ¶23.

77.     In the third quarter of 2007, Fannie Mae reported $9.89 billion dollars of deferred tax assets.  In the fourth quarter 10-Q, Fannie Mae reported approximately $12.97 billion in deferred tax assets.  Fannie Mae continued to increase its recognition of deferred tax assets throughout 2008, reporting $17.8 billion in the first quarter 10-Q and $20.6 billion in the second quarter 10-Q:

| Quarterly Report | Losses (in billions) | Deferred Tax Assets (in billions) |
|---|---|---|
| 10-Q 3rd Quarter 2007 | $1.52 | $9.89 |
| 10-K 4th Quarter 2007 | $3.6 | $12.97 |
| 10-Q 1st Quarter 2008 | $2.2 | $17.8 |
| 10-Q 2nd Quarter 2008 | $2.3 | $20.6 |
| 10-Q 3rd Quarter 2008 | $29.0 | $4.6 |

78.     Fannie Mae inflated its capital base by using deferred tax assets and presented the appearance that the company was financially strong when, in fact, the company did not have sufficient capital to support its losses.  Without recognizing the deferred tax assets, Fannie Mae could not meet its minimum capital requirements:

| Reported in billions | | | | |
|---|---|---|---|---|
| Date | Statutory Minimum | FHFA[46]/OHEO Minimum | Core Capital | Capital Without Deferred Tax Assets |
| 09/30/07 | $30.303 | $39.393 | $41.713 | $31.823 |
| 12/31/07 | $31.927 | $41.505 | $45.373 | $32.403 |
| 03/31/08 | $31.335 | $37.602 | $42.676 | $24.876 |
| 06/30/08 | $32.631 | $37.525 | $46.964 | $26.364 |

79.     Without recognizing offsets from deferred tax assets, Fannie Mae did not meet the statutory minimum capital requirements in the first and second quarter of 2008 and would not have met the mandated surplus requirement established by the OFHEO in the third and fourth

---

[46] Federal Housing Finance Agency ("FHFA"), as of July 30, 2008, regulates Fannie Mae, Freddie Mac and other lending institutions.

quarters of 2007.    For Fannie Mae, not reporting deferred tax assets would have resulted in falling well below its minimum requirements.

80.    Even when Fannie Mae did recognize large profits, the deferred tax assets did not have value because the company already had large numbers of affordable housing tax credits, which offset profits.[47]

81.    Fannie Mae continuously touted its capital holdings affirming that it held capital above the minimum requirements, but much of its capital base involved assets which would not be realized in the future with the deteriorating real estate market.

82.    George Victor, a partner at Holtz Rubenstein Reminick, LLP, an accounting firm, stated, "when a company has had a continued loss and doesn't anticipate future profits to offset the deferred-tax assets, it – shouldn't be on the books."[48]

83.    An article issued on September 14, 2008, in *Financial Week* stated:

> Other companies, especially commercial banks, could also boost their capital with deferred-tax assets and get away with it to a certain extent. But only the banks, or at least big ones, might be able to count on auditors and regulators being as lax on them as they were on Fannie and Freddie, because of the risk to the financial system their failure might pose.[49]

84.    On October 29, 2008, *The New York Times* stated that "deferred tax assets became controversial for Fannie Mae after the company posted a string of surprising quarterly losses, which hamstrung its ability to raise capital to offset losses from rising foreclosures."[50]

85.    As Fannie Mae reassured the public that its capital base was strong enough to withstand the market, Plaintiff invested $15 million in the Preferred Stock.    Only after this

---

[47]  Gretchen Morgenson and Charles Duhigg, *Mortgage Giant Overstated the Size of its Capital Base*, NYTimes.com, (September 6, 2008).
[48]  Marine Cole, *Financial Week*, "IRS break boosts Fannie, Freddie", September 14, 2008, *available at* http://www.financialweek.com/apps/pbsc.dll/article?AID=/20080914/REG/809129952.
[49]  Marine Cole, *Financial Week*, "IRS break boosts Fannie, Freddie", September 14, 2008, *available at* http://www.financialweek.com/apps/pbsc.dll/article?AID=/20080914/REG/809129952.
[50]  *Fannie Mae to Write Down Deferred Tax Assets*, NYTimes.com, October 29, 2008, *available at* http://www.nytimes.com/2008/10/30/business/30fannie.html.

purchase did the news become public that Fannie Mae would not expect to realize its deferred tax assets and that the capital held by the company was in such dire condition that the government felt compelled to place Fannie Mae under conservatorship.

86.     A *Bloomberg* report dated October 29, 2008, revealed that the use of deferred-tax assets and other accounting methods by Fannie Mae to inflate their capital was cited by regulators as one of the reasons why the government took control.[51]

87.     Treasury Secretary Henry Paulson, in a statement regarding Fannie Mae and Freddie Mac issued on September 7, 2008, stated:

> Based on what we have learned about these institutions over the last four weeks – including what we learned about their capital requirements – and given the condition of financial markets today, I concluded that it would not have been in the best interest of the taxpayers for Treasury to simply make an equity investment in these enterprises in their current form.

88.     Fannie Mae's government-appointed Chief Executive Officer, Herb Allison, stated that all of Fannie's assets would be revalued.[52]   Soon after, Fannie Mae wrote down over $20 billion in deferred assets.   In the third quarter of 2008, Fannie Mae's core capital dropped from $47 billion to $16.6 billion, less than half of the $33 billion in statutory minimum capital it was required to maintain.

## 2.     Failure to Write Down Other-Than-Temporary Impairments

89.     The Financial Accounting Standards Board ("FASB") requires that all material information be disclosed that is necessary to ensure that the company validly represents underlying events and conditions. FASB is an organization that develops generally accepted accounting principles ("GAAP") and issues bulletins called FAS statements. FAS Statement No. 115 requires an institution to determine whether a decline in fair value below amortized cost for

---

[51] Bloomberg, *Fannie Mae to Reduce Value of Deferred Tax Assets*, October 29, 2008.
[52] *Id.*

an individual available-for-sale security is other-than-temporary.  If the security is considered to be other-than-temporary, the security must be written down to the fair value and the amount of the write-down must be included as a realized loss.  Available-for-sale securities made up 33% of Fannie Mae's total assets at the end of 2007.

90.     GAAP is the standard framework of guidelines for financial accounting used in the United States and includes the standards, conventions, and rules for accountants to follow in recording and summarizing transactions and in the preparation of financial statements. SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes or other disclosures. GAAP requires reporting by means of fair value accounting. Fair value accounting is financial reporting which requires a company to measure certain assets and liabilities "at estimates of the prices they would receive if they were to sell the assets or would pay if they were to be relieved of the liabilities."  GAAP defines fair value of an asset as the amount at which the asset could be bought or sold in a current transaction other than in a forced or liquidation sale.

91.     FAS Statement No. 115 specifies that if an institution "is unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition, another-than-temporary impairment shall be considered to have occurred."

92.     For the second quarter of 2008, Fannie Mae reported $6.6 billion in unrealized loss to its available-for-sale securities but recognized only $507 million in other-than-temporary impairment.  Beginning in the third quarter of 2007, Fannie Mae reported only $84 million in other-than-temporary impairment and $727 million, $55 million, $507 million, $1.8 billion in the following quarters.  However, in the fourth quarter 10Q of 2008, when Fannie Mae's failing

financial position was exposed, Fannie Mae reported $4.5 billion in other-than-temporary impairment.

93.     Fannie Mae did not recognize other-than-temporary impairments to its available-for-sale securities with the appropriate write-downs.  As a result, these unrealized losses were not included within Fannie's core capital calculations and the investing public had an eroneously inflated perception of Fannie Mae's core capital.

### 3.     Insufficient Loss Reserves

94.     When Fannie Mae determines a loan is uncollectible, Fannie Mae is supposed to record the charge-off against its loss reserves.   However, notwithstanding increasing uncollectible loans, Fannie Mae's loss reserves did not account for the significant credit risk it was undertaking which inflated its core capital and misled its investors.

95.     Fannie Mae's 2006 10-K stated that Fannie Mae expected the "overall serious delinquency rates to increase in 2007."  Moreover, a January 2007 internal report forecasted a 50% decline in home prices over a three to five year period.[53]   Therefore, Fannie Mae's credit losses were likely to increase over the next several years.   However, Fannie Mae failed to increase its loss reserves in correlation with the expected market change.  Fannie Mae did not account for these economic changes until the fourth quarter of 2007, when it reported a $2 billion increase in loss reserves for a total of $3.4 billion in loss reserves, well after the market had begun its decline.

96.     Indeed, even without considering the minimum statutory requirement, Fannie Mae was expected to hold sufficient capital reserves to withstand a decline of housing prices comparable to a severe recession.

---

[53] Fannie Mae Strategic Plan 2007-2011 – Produced by the House Committee on Oversight and Government Reform: FM-COGR_00011806 – FM-COGR_00011900, *available at* http://www.fcic.gov/hearings/pdfs/2010-0409-fannie-mae-strategic-plan.pdf.

97.     In the wake of Freddie Mac and Fannie Mae's respective accounting scandals between 2001 and 2004, OFHEO imposed on both of the GSEs a 30 percent required capital surcharge above the statutory requirement.[54]  The minimum capital requirement was therefore 3.25 percent.[55]

98.     All named Defendants knew about Fannie Mae's lack of capital base and wrongfully ignored the red flags raised by Fannie Mae's lack of adequate reserves.

### 4.     Weak Risk-Based Capital

99.     In testimony to the Congressional Oversight Committee, Arnold Kling, a senior economist at Freddie Mac from 1986-1994, blamed Fannie Mae for taking on more risk than it should have, with less capital than was prudent.

100.     On November 9, 2007, Fannie Mae issued a press release entitled "Fannie Mae Files 2007 Quarterly Reports with the SEC – Company Returns to Current Financial Reporting" wherein Mudd represented that Fannie Mae was in "solid shape to support the market."

101.     The report went on to brag that "Fannie Mae's core capital in the third quarter was $41.7 billion, $2.3 billion above the level mandated by the OFHEO-directed 30 percent capital surplus requirement."

102.     What Mudd failed to say was that because of improper or fraudulent risk management without the inclusion of unattainable and unrecognizable deferred tax assets, Fannie Mae would not have met its minimum capital requirements.

---

[54] Fannie Mae is required by statute to hold a minimum capital of 2.5 percent of on-balance sheet assets.  This leverage capital requirement is lower than those for Federal Home Loan Banks ("FHLB") or for private financial institutions.

[55] James B. Lockhart III, Director, Office of Federal Housing Enterprise Oversight, "Reforming the Regulation of Government Sponsored Enterprises", Statement Before the Senate Banking, Housing and Urban Affairs Committee (February 7, 2008), *available at* http://www.fhfa.gov/webfiles/1453/2708Lockhart.pdf.

103.   On a November 9, 2007, conference call, Nandu Narayanan, an analyst from

Trident Investment Management posed the following question to Mudd:

> Given your equity capital of $40 billion and given that more people are saying that
> this might be one of the worst housing markets since the Great Depression.  Because
> we've never had a national home price decline since the Great Depression, and
> given that with $40 billion of capital, you've got something in the order of $3 trillion
> of risk.  You know, what do you see as the prognosis?

104.   Mudd responded, in part, by saying:

> Do we plan for all kinds of scenarios?  Yes.  Do we plan for scenarios that might be
> significantly worse than what we are projecting?  Yes.  Is that what we hold capital
> against?  Yes.  Is our total capital more than our risk-based capital?  Yes.  Is this a
> time to be conservative from a capital standpoint?  Yes, it is.  Is this a time to take
> these issues and these scenarios extremely seriously?  Yes.  Is this a time to make
> sure that we are beefing up all of our back-end resources to manage loss mitigation
> and foreclosures?  Yes.  Are we doing that?  Yes.  Do we know what's going to
> happen?  No. That's when I finally have to give you a no answer.  But are we
> prepared for scenarios that are somewhat historical?  Yes.

105.   Mudd represented to investors that Fannie Mae was prepared for a severe crisis.

However, the truth as proper risk management reporting would have made clear was that Fannie

Mae was severely undercapitalized and could not weather a substantial downturn in the market.

These conditions forced the government to take control of Fannie Mae and to correct its financial

position.

106.   During the November 9, 2007 conference call, Howard Shapiro, an analyst from

Fox-Pitt Kelton asked:

> Okay, so if you we[re] to have a very large charge of some magnitude, you could
> conceivably be undercapitalized, or your capital ratios would go below the 30%
> OFHEO surcharge; that is conceivable?

107.   Swad avoided a direct response to Shapiro's question by saying:

> I think the way to think about it is, our capital is affected by GAAP earnings.  SOP
> 03-3 is a component of GAAP earnings, as is our 22 basis point G fee revenue and
> growing.  And to look at any one line item I don't think is the appropriate way to
> look at it.  Just to remind you, we have over $2 billion of excess above the
> minimum.

108.     Fannie Mae and the Officer Defendants continuously attempted to reassure the market that it had adequate capital and downplayed its losses.

109.     During a November 16, 2007 conference call with analysts, Citigroup Analyst Brad Ball asked about Fannie Mae's capital adequacy.  Swad boasted:

> We disclosed over $41 billion of capital as of September [30, 2007] and over $2 billion of excess.   And I also want to highlight that we are currently in an environment where there are very profitable incremental investments in both of our major businesses, on the Single-Family side and on the Capital Market side, where we believe we can make investments and earn returns well above our cost of capital.

110.     Fannie Mae announced the issue of new preferred shares in December 2007 to provide additional funds for managing higher risk in the housing and credit markets.

111.     On February 27, 2008, Fannie Mae reported fourth quarter and full year 2007 financial results, reporting a net loss of $2.1 billion, or ($2.63) per diluted share, versus net income of $4.1 billion during 2006.  The company also reported substantial losses from subprime and Alt-A mortgages.  However, Fannie Mae continued to stress that its capital base was strong.

112.     During a February 27, 2008 conference call regarding Fannie Mae's 2007 results, Mudd reassured investors:

> The number one priority is capital.  We want to stay long capital.  2007 was a tough year.  2008 will be tough as well.  And 2009 we do not anticipate will be particularly rosy, so through this period, capital remains king and we want to remain long capital…

> The third priority, responding to the crisis.  We're fully cognizant of the fact that responding in crisis is something that we were chartered to do, that we have to marshal capital to play that role, which is providing liquidity and stability and affordability in the markets, including now the jumbo market as well.

113.     Mudd concluded his remarks commenting:

> So we're not making – we're not under any illusions here.  I think we're being realistic.  This is a tough environment.  We are taking all the necessary steps to manage our way across it to move across that bridge I have talked about.

114.    However, while recognizing the difficulty in the real estate market, Fannie Mae continued to hide the truth from investors and create the illusion of financial health and stability by reporting deferred tax assets as a significant portion of its capital base.

115.    During the February 27, 2008 conference call with investors, Fannie Mae continued to assure the public that it was taking a conservative approach to managing capital. "As the market recovers, we will be a prime beneficiary," Mudd said, "when the housing market finally stabilizes, the company will 'feast' on the mortgages it is currently buying."

116.    Mudd also claimed in the same call, "You can see we ended 2007 with $47.4 billion in core capital, that's $13.4 billion above the statutory minimum and $3.9 million above the OFHEO-mandated 30% level."   He continued by emphasizing that Fannie Mae was managing its capital account "very conservatively."

117.    Additionally, on the February 27, 2008 conference call with investors, Levin, reassured investors saying "[o]ur operating philosophy for capital is to manage it to protect ourselves against market scenarios more adverse than we expect.  ***It's a conservative approach to managing the capital***." (Emphasis added.)

118.    Swad also made statements in the same February 2008 conference call regarding Fannie Mae's capital base.  He stated:

> [W]e ended 2007 with $45.4 billion in [core] capital, that's $13.4 billion above the statutory minimum and $3.9 [billion] above the OFHEO-mandated 30% level.  In addition, we have got approximately $50 billion of very short-term maturing assets, mainly bank deposits within our liquid investment portfolio against which we hold $1.6 billion in capital.  We can reduce our capital requirement and thereby increase our capital surplus just by permitting these highly liquid ass[ets] to mature without replacement.  So the $3.9 billion of stated [assets], plus 1.6 in capital applied to short-term assets is $5.5 billion, which I view as potential capital.

119.     On the February 27, 2008, conference call, Mudd commented:

I think there are two things, and I talked about them in my remarks.  One is to be **conservative in terms of protecting the capital** that we have, but the other is to be aware that we are trying to build for the future.

120.     However, Moshe Orenbuch, an analyst with Credit Suisse in New York noted that while many companies took partial reserves against their deferred tax assets, Fannie Mae "recognized the entire tax asset, which was certainly on the aggressive side."[56]

121.     On a February 27, 2008 conference call, with respect to capital raised in the market, Mudd repeatedly stressed that Fannie Mae approached its capital base conservatively:

The additional capital we're raising will bolster our "protect and grow" strategy – it will allow us to maintain a **strong, conservative balance sheet** through the housing correction, pursue growth opportunities to enhance long-term shareholder value, and provide liquidity and stability to the secondary market.

(Emphasis added)

122.     On May 6, 2008, Fannie Mae announced it would raise $6 billion in new funds. To entice investors, Fannie Mae, the Officer Defendants and the Underwriter Defendants wrongfully downplayed its exposure to losses and exaggerated the strength of its capitalization. In short, all defendants dispelled concerns about Fannie Mae's financial strength.

123.     Also on May 6, 2008, days before Plaintiff purchased its Preferred Series T shares, Fannie Mae held its first quarter earnings conference call.  During that call, Mudd spoke about the new capital being raised:

So, taking together, all of those factors mean that **we will have more capital to protect the balance sheet**, to grow the business, and to serve the market.  So, all told, including this prospective capital raise that we're undertaking starting today, we will go into the belly of this cycle with about **$48 billion in core capital which is about $17 billion above our statutory capital level**.

---

[56] Bloomberg, *Fannie Mae to Reduce Value of Deferred Tax Assets*, October 29, 2008.

We've said before that **this is the time to be long capital and this plan firmly gets us there**.  We plan to harness the capital we're raising for three goals – **one, to attain a position of unquestioned capital strength**; two, to pursue the best business opportunities we have seen without constricting capital; and three to step out and play a major role in helping the market recover better and sooner and to the benefit of all investors in housing whether they be consumers or originators or realtors or homebuilders or investors of Fannie Mae.

(Emphasis added)

124.    Mudd concluded:

Let me now close out on the brief discussion of the capital plan.  Our strategy for working through this period is to protect and grow.  That means protecting the company by building and conserving capital and setting aside the right amount of loss reserves as we continue to work to reduce foreclosures and credit losses.  This strategy also means growing our business as we help stabilize the market and perform our mission.

125.    On June 25, 2008, – not long after Plaintiff's purchase of Preferred Stock – Fannie Mae reported a two-fold increase in mortgage delinquency rates over the prior year period, but claimed "We're managing our portfolio in a safe and sound manner."[57]   Despite Fannie Mae's representations regarding its management of its portfolio and capital reserves, in truth the company was without adequate risk controls and was severely undercapitalized.

126.    In a July 11, 2008 statement concerning Fannie Mae's capital adequacy, Chuck Greener,  Fannie Mae Senior Vice President, said:

Fannie Mae raised $7.4 billion of additional capital in May, for a total of more than $14 billion in new capital in November of 2007.  **Our capital level is substantially above both our statutory minimum capital and the OFHEO-required 15 percent surplus over minimum capital**.  **In fact, we have more core capital, and a higher surplus over our regulatory requirement, that at any time in the company's history.**

As we work through this tough housing market, **we are maintaining a strong capital base, building reserves for our credit losses**, and generating solid revenues as our business continues to serve the market.  We also have access to ample sources of liquidity, including access to the debt markets.  The company issues more than $24 billion in debt alone, including a $3 billion Benchmark Notes sale that was

---

[57]David S. Hizenrth, *Delinquencies Rise at Fannie Mae, Freddie Mac*, Washington Post (June 26, 2008), at D1.

oversubscribed.  In short, Fannie Mae remains well-equipped to fulfill our critical role in the housing financing system, today and in the future.

(Emphasis added)

127.     In truth, without its deferred tax assets, Fannie Mae would not have met its capital requirements - much less held sufficient capital to withstand a severe crisis.

128.     The statements regarding Fannie Mae's capital base were materially false and misleading because the reported capital was inflated due to the overuse of deferred tax assets. Fannie Mae continuously included the full value of deferred tax assets without any write-down reflecting the likelihood that they would never be useable as an offset to earnings.

129.     Fannie Mae continued to mislead the public when it said its regulatory capital stood at $47 billion as of June 30, 2008; $14.3 billion above its statutory minimum capital requirement and $9.4 billion above its 15 percent surplus requirement. Over $20 billion of that regulatory capital, approximately 43%, consisted of deferred-tax assets, up from $13 billion at the end of 2007.

130.     Despite Fannie Mae's deteriorating financial position, the company continued to release positive statements with regard to its capital base stating that it not only had sufficient capital, but a **strong** capital base.

131.     As the housing market declined, Fannie Mae continued to reassure investors that it had sufficient capital to withstand the downturn even with its substantial exposure to the market.  Fannie Mae continued to conceal that it did not have adequate capital to overcome the market conditions.

132.     On October 9, 2008, the FHFA published a news release stating that:

Director ***Lockhart is classifying Fannie Mae and Freddie Mac as of June 30, 2008, prior to the conservatorship, as undercapitalized*** using FHFA's discretionary authority provided in the statute.  Both Fannie Mae and Freddie Mac have publicly

released financial results for the second quarter of 2008.  Although both Enterprises' capital calculations for June 30, 2008, reflect that they met the FHFA and statutory requirements for capital, the continued market downturn during late July and August raised significant questions about the sufficiency of capital.  The following factors, which led to the need for conservatorship, support the Director's decision to downgrade the classification to undercapitalized:

- Accelerating safety and soundness weaknesses, especially with regard to credit risk, earnings outlook, and capitalization;
- Continued and substantial deterioration in equity, debt, and MBS market conditions;
- The current and projected financial performance and condition of each company as reflected in its second quarter financial reports and our ongoing examinations;
- The inability of the companies to raise capital or to issue debt according to normal practices and prices;
- The critical importance of each company in supporting the country's residential mortgage market; and
- Concerns that a growing proportion of their respective statutory core capital consisted of intangible assets.

(Emphasis added)

133.    This press release revealed and confirmed that Fannie Mae was not managing its capital conservatively.

**5.      The Reality of Fannie Mae's Financial Position**

134.    In a July 9, 2008 *Bloomberg* report, Friedman, Billings, Ramsey & Co. analyst Paul Miller observed, "Fannie and Freddie are going to have to raise more capital and nobody thinks they're going to be able to raise capital when they need to.  It's going to be very expensive."

135.    On July 10, 2008, former St. Louis Federal Reserve Board President William Poole stated in an interview that Fannie Mae was technically insolvent.[58]

---

[58] David S. Hizenrth, *Delinquencies Rise at Fannie Mae, Freddie Mac*, Washington Post (June 26, 2008), at D1.

136.     On July 11, 2008, *The New York Times* published an article titled "U.S. Weighs Takeover of Two Mortgage Giants," indicating that the federal government was considering a plan to take over Fannie Mae and place it into a conservatorship.[59]

137.     On July 30, 2008, President Bush signed a housing rescue bill which included a Fannie Mae bailout.[60]   Specifically, Fannie Mae was given an unlimited line of credit with the United States Treasury (increased from $2.25 billion).   The bill also authorized the Treasury to purchase shares in Fannie Mae, if necessary.[61]   However, even this measure proved to be insufficient.

138.     On September 2, 2008, Fitch Ratings lowered its rating on Fannie Mae preferred stock to just one level above junk status, citing: (a) Fannie Mae's lack of capitalization due to its lack of reliable access to equity markets; and (b) Fannie Mae's $307 billion in Alt-A mortgages.[62]

139.     On September 7, 2008, the government placed Fannie Mae into conservatorship.

140.     That same day, *Market Watch* published the report "Washington takes over Fannie Mae, Freddie Mac" which stated, "Henry Paulson told reporters that a careful review of the two mortgage giant's books made it 'necessary to take action.'"

141.     The report continued:

There were reports that auditors called in by the Treasury and FHFA had found accounting irregularities at the two firms and that their capital base was smaller than expected.

*          *          *

---

[59] Stephen Labaton and Steven R. Weisman, *U.S. Weighs Takeover of Two Mortgage Giants*, NYTimes.com (July 11, 2008).
[60] *See* Jeanne Sahadi, *Bush Signs Housing Rescue Law*, CNNMoney.com (July 30, 2008)
[61] *Id.*
[62] Jeff Clabaugh, *Fannie Mae, Freddie Mac Preferred Stock Cut at Fitch*, Washington Business Journal (September 2, 2008).

At first, Paulson had talked in terms of an equity investment in the two firms.  But after review, a full-scale takeover of the two firms was seen as the only option.

142.    A *Bloomberg* article published on September 9, 2008, entitled, "Fannie Mae, Freddie 'House of Cards' Prompts Takeover" reported:

> Once they got someone looking closely at Fannie and Freddie's books, they realized there just wasn't adequate capital there," U.S. Senator Richard Shelby of Alabama, the ranking Republican on the Senate Banking Committee, said after a briefing by Treasury officials.  "They found out they had a house of cards."
>
> *            *            *
>
> Fannie and Freddie's accounting during the housing crisis appears to have been more fantasy than reality," said Rosner, who first highlighted problems in 2003, before the two companies were forced to restate about $11.3 billion in earnings.
>
> *            *            *
>
> After looking through the finances, Fed examiners deemed their capital reserves too low, Dallas Fed[eral Reserve] President Richard Fisher said yesterday.
>
> We concluded that the capital of these institutions was too low relative to their exposure," Fisher said in response to an audience question after a speech in Austin, Texas.  Further, **"*that capital in and of itself was of low quality*."**

(Emphasis added)

143.    James Lockhart, director of OFHEO revealed that much of Fannie Mae's assets were based on intangible assets that did not amount to actual cash that could be used.[63]

144.    According to Dallas Federal Reserve President, Richard Fisher, examiners from the Federal Reserve found that in addition to thin and low quality capital the company may have been understating their losses.[64]

145.    On September 9, 2008, Standard & Poor's announced that, following the close of trading on September 10, 2008, it would remove Fannie Mae from the S&P 500, citing the fact

---

[63] Fannie Mae to Reduce Value of Deferred Assets (update 2), *Bloomberg*, October 29, 2008.
[64] *Id.*

that the company's capitalization had fallen well below the $5 billion required to list among the S&P 500.[65]

146.     After Plaintiff invested $15 million in Fannie Mae, the truth about the company's capital base was revealed.  Although Fannie Mae, the Officer Defendants, and the Underwriter Defendants represented that Fannie Mae's capital was being managed conservatively and that the company had sufficient capital to weather a market more adverse than expected, the reality was Fannie Mae reported deferred tax assets that could not be realized in future quarters, retained insufficient capital and was more heavily invested in the failing portions of the market than other financial institutions.

### E.     Fannie Mae's Risk Management Failures

147.     As the real estate market became increasingly risky, Fannie Mae became a lead investor in risky loans.  Fannie Mae, each Officer Defendant and the Underwriter Defendants all aided in the fabrication of misinformation as a means of reassuring investors that its risk was being controlled.

148.     On December 9, 2008, House of Representatives Committee on Oversight and Government Reform held a hearing regarding the takeover of Fannie Mae and Freddie Mac revealing Fannie Mae's entry and involvement in risky loans.

149.     Among documents produced to the Oversight Committee from Fannie Mae was a confidential presentation from June 27, 2005, which stated:  "We face two stark choices:  (1) Stay the course; or (2) Meet the market where the market is."  "Stay the course" meant focusing predominantly on more secure, prime and fixed-rate mortgages.  The presentation explained that this option would "maintain our strong credit discipline" and "protect the quality of our book."

---

[65] Press Release, Standard & Poor's, *Standard & Poor's Announces Changes to U. S. Indices*, September 9, 2008.

150.     But according to the presentation, the "meet the market where the market is" was in buying subprime and other alternative mortgages.  To pursue this course, the company would have to "accept higher risk and higher volatility of earnings."  This presentation admitted that homes were "being utilized … like an ATM."  It acknowledged that investing in subprime and alternative mortgages would mean "higher credit losses" and "increased exposure to unknown risks." Even though established as a conservative stable GSE, Fannie Mae did not want to be left behind as its competitors sought higher potential earnings and instead strived to "meet the market where the market is."

151.     The documents produced to the Oversight Committee make clear that Fannie Mae knew the risk involved in the subprime meltdown, because their own risk managers repeatedly warned about the dangers of investing heavily in the subprime and alternative mortgage market.

152.     On November 10, 2005, a top Fannie Mae official warned with respect to private-label securities that layering of risk had not adequately been reflected in their pricing.[66]

153.     On September 20, 2007, Mudd stated in a Congressional hearing that Fannie Mae could provide more help to the home finance market without taking risks.

154.     On October 28, 2006, Fannie's Chief Risk Officer, Enrico Dallavecchia, sent an email to Mudd warning about control processes.  He informed Mudd:

> Dan, I have a seri[ous] problem with the control process around subprime limits.
>
> The business actions in terms of ramping up business much faster than what would be consistent with the $5 [billion] limit for [the] year end we agreed upon less than two months ago is de facto preventing me to exercise my reserved authority to determine limits without damaging relationships with customers.

---

[66]Staff of Committee on Oversight and Government Reform, 111th Congress, Report on The Role of Government Affordable Housing Policy in Creating the Global Financial Crisis of 2008, July 7, 2009, *available at* http://blog.heritage.org/wp-content/uploads/2009/07/7-7-09-housing-crisis-report.pdf.

This is on top of the recent lack of process on the Chase deal (also a limit excess on concentration and debt to income ratios), and after we approved twice (in March and in June) to buy loans without having completed the new business initiative.

There is a pattern emerging of inadequate regard for the control process.

155.     On July 16, 2007 Dallavecchia sent an email to Fannie Mae's COO, Michael Williams, stating:

Doing the budget for n[e]xt year off my forecast with a 16pct further reduction in budget is best being ill informed or maybe…[is] due to malice.  I find it offensive to my intelligence and that of my staff.

The company has one of the weakest control processes I [have] ever witness[ed] in my career…This company really doesn't get it, we are not even current and we are already back to the old days of scraping controls and people…

156.     On July 16, 2007, he forwarded this email to Mudd and added to it complaining that the Board of Directors had been told falsely that "we have the will and the money to change our culture and support taking more credit risk."  Dallavecchia wrote:

I do not even think that with what I was given for 2008 is adequate for the current risk, considering how far we already are from adequate market practices.

I have been saying that we are not even close to having proper control processes for credit market and operational risk.  I got a 60 percent budget cut.  Do I look stupid?

157.     At a December 9, 2008, Congressional hearing, Mudd admitted that he was warned in October 2006 that Fannie Mae "[was] rushing into billions of dollars worth of subprime loan purchases without really knowing what [it was] doing."

158.     Moreover, Marc Gott, a former director in Fannie Mae's loan servicing department stated, "We didn't really know what we were buying…This system was designed for plain vanilla loans and we were trying to push chocolate sundaes through the gears."[67]

---

[67] Charles Duhigg, *Pressure to Take More Risk, Fannie Reached Tipping Point*, New York Times (Oct. 4, 2008).

159.   Mortgage experts, Peter Wallison and Charles Calomiris stated:

The Fannie Mae propaganda machine purposefully misled people into believing that it was keeping risk low and operating under an adequate prudential regulatory regime.[68]

160.   Moreover, Confidential Witnesses cited in the Class Action Complaint for *In re: Fannie Mae 2008 Securities Litigation,* and described in Judge Crotty's Opinion and Order issued on September 30, 2010,[69] stated Fannie Mae did not evaluate the risk of the subprime mortgage pools it bought; it did not have a model to evaluate them.   Upon information and belief, since Fannie Mae did not have the ability to analyze pools in-house, it relied on ratings issued by ratings agencies to guide its mortgage pool purchases.

161.   Even though Fannie Mae's risk officers recognized that the company was not adequately managing its risk and warned the Officer Defendants of potential problems, Fannie Mae reported in the Risk Management section of its SEC filings each year that it was properly managing risks.

162.   According to an October 2008 New York Times article, Mudd stated, "Fannie Mae faced the danger that the market would pass us by…We were afraid that lenders would be selling products we weren't buying.…"[70]  The same article reported that in or around late 2004/early2005:

Fannie had a longstanding and lucrative relationship with Countrywide, which sold more loans to Fannie than anyone else.  But…[Countrywide]…threatened to upend their partnership unless Fannie started buying Countrywide's riskier loans.[71]

---

[68] Wallison and Calomiris, *The Last Trillion Dollar Commitment – The Destruction of Fannie Mae and Freddie Mac*, September 2008.
[69] *See* Docket Entry No. 288, 1:08-CV-07831-PAC.
[70] Duhig, Charles, *Pressured to Take More Risks, Fannie Reaching Tipping Point,* October 4, 2008.
[71] *Id.*

163.    Fannie Mae began investing heavily in the risky loans offered by Countrywide even though Fannie Mae knew that it was unequipped to handle the risks.  In the early 1990's, "Fannie and Freddie publicly announced they were no longer buying [Alt-A] loans because they were too risky."[72]

164.    Moreover, an internal presentation from June 27, 2005 stated Fannie Mae had a lack of: 1) capabilities and infrastructure and 2) knowledge of the credit risks.  The presentation also noted that market participants were not appropriately pricing for risk.    Additionally, a Fannie Mae document from March 2005 noted that:  "Although we invest almost exclusively in AAA-rated securities, there is a concern that rating agencies may not be properly assessing the risk in these securities."[73]

## F. Fannie Mae Misrepresents Risks

165.    Fannie Mae boasted about its superior risk management as stating in an OFHEO "Report of the Special Examination of Fannie Mae" dated May 2006, "Fannie Mae senior management promoted an image of the Enterprise as one of the lowest-risk financial institutions in the world and as 'best in class' in terms of risk management, financial reporting, internal control, and corporate governance."

166.    On November 8, 2006 Fannie filed 10-Q for the period ending September 30, 2006, and in it stated:

> We have increased our participation in types of products where we have concluded that it would be economically advantageous or that it would contribute to our mission objectives. Our participation in these products reflects our assessment of anticipated guaranty fee income in light of our expectation for potentially higher credit losses.  We continue to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types…*We believe that our assessment and approach to the management of*

---

[72] Written Statement of Edward J. Pinto before the Committee on Oversight and Government Reform, U.S. House of Representatives, December 9, 2008, at 9.
[73] Single Family Guaranty Business, Facing Strategic Crossroads: June 27, 2005 – Produced by the House Committee on Oversight and Government Reform: FM-COGR_00088741-00094025.

*credit risk continued to contribute in the third quarter of 2006 to the maintenance of a credit book of business with strong credit characteristics*.

167.      On December 6, 2006, Fannie Mae filed its 10-K for 2004[74] signed by, among

others, Defendants Ashley and Mudd.  With regard to risk management, the annual filing stated:

> Effective management of risks is an integral part of our business and critical to our safety and soundness. In the following sections, we provide an overview of our corporate risk governance structure and risk management processes, which are intended to identify, measure, monitor and control the principal risks we assume in conducting our business activities in accordance with defined policies and procedures. Following the overview, we provide additional information on how we manage each of our four major categories of risk. In "Item 1A—Risk Factors," we identify other risk factors that may adversely affect our business.

**Risk Governance Structure**

> We made significant organizational changes in 2005 and 2006 to enhance our risk governance structure and strengthen our internal controls due to identified material weaknesses. During 2005, we adopted an enhanced corporate risk framework to address weaknesses in our risk governance structure. This new framework is intended to ensure that people and processes are organized in a way that promotes a cross-functional approach to risk management and controls are in place to better manage our risks. Basic tenets of our corporate risk framework include establishing corporate-wide policies for risk management, delegating to business units primary responsibility for the management of the day-to-day risks inherent in the activities of the business unit, and monitoring aggregate risks and compliance with risk policies at a corporate level.

> **Risk Policy and Capital Committee of the Board of Directors**

> The Board of Directors is responsible for approving our risk governance framework and providing capital and risk management oversight. The Board exercises its oversight of credit risk, market risk, operational risk and liquidity risk primarily through the Board's Risk Policy and Capital Committee. The responsibilities of the Risk Policy and Capital Committee include:

> - recommending for Board approval enterprise risk governance policy and limits consistent with our mission, safety and soundness;

> - overseeing the development of policies and procedures designed to: (i) define, measure, identify and report on credit, market, liquidity and operational risk; and (ii)

---

[74] Fannie Mae did not file timely financial results beginning in July 2004, through November 9, 2007.

establish and communicate risk management controls throughout the company;

• overseeing compliance with all enterprise-wide risk management policies;

• overseeing the Chief Risk Office; and

• reviewing the sufficiency of personnel, systems and other risk management capabilities.

In 2006, the Board of Directors adopted corporate risk principles that are being implemented to govern our risk activities. These principles include taking risks in an informed and disciplined manner and ensuring that we are adequately compensated for the risks we take, consistent with our mission goals.

168.    The statements regarding risk controls in the 2006 10-Qs and 2006 10-K constitute a misrepresentation as can be seen from the emails described above from Dallavecchia to Mudd from 2006 through 2007 concerning Fannie Mae's risk controls.

169.    On February 27, 2007, Fannie Mae filed its Form NT 10-K.  In that filing, Fannie Mae stated: "We continue to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types."

170.    In the February 27, 2007 conference call with investors, Dallavecchia stated:

I think from a control and risk underwriting standpoint, we want to continue maintaining prudent underwriting standards.  One thing that we always look very carefully to is the layering of the risk, not that all subprime loans are bad, but there's some conditions where all risks are layered one on top of the other which makes risk higher.  And we want to make sure that we understand the risk and we are remunerated for it.

171.    In that same call, Mudd stated: "we have a book of business with very strong credit risk characteristics."  He also added:

With the creation of the CRO position and the CRO office also came an appropriate set of processes and controls that went around that…that involved a process of setting standards and settle limits.

172.    The statements by Dallavecchia and Mudd on February 27, 2007 were false and misleading as can be seen from the emails described above from Dallavecchia to Mudd from 2006 through 2007 concerning Fannie Mae's risk controls.

173.    On May 2, 2007, Fannie Mae filed its 10-K for 2005 signed by, among others, Ashley and Mudd.   Fannie Mae's filing included statements substantially similar to the statements in its 2004 10-K set forth above. In addition, Fannie Mae's 2005 10-K stated:

> At the end of 2006, we restructured our risk management committees to enhance our risk governance framework. We dissolved the Corporate Risk Management Committee, which had previously focused on both credit and market risk oversight, and formed two separate committees, the Credit Risk Committee and the Market Risk Committee. We now have three management-level risk committees that focus on our major categories of risk: (i) the Credit Risk Committee, which focuses on credit risk; (ii) the Market Risk Committee, which focuses on market, liquidity and model risk; and (iii) the Operational Risk Committee, which focuses on operational risk.  Each committee is responsible for, among other things:
>
> • monitoring aggregated risk exposure;
>
> • discussing emerging risk issues;
>
> • reviewing key corporate risk limits and exposures;
>
> • reviewing the risk aspects of significant new business initiatives; and
>
> • reviewing and recommending risk policies with corporate-wide or significant business unit implications.
>
> We also established two additional management-level risk committees that focus on other significant business risks: (i) the Capital Structure Committee, which focuses on capital management activities; and (ii) the Compliance Coordination Committee, which focuses on compliance with legal and regulatory requirements. Our Compliance Coordination Committee also is responsible for coordinating the legal and regulatory compliance risk governance functions with other control functions, such as Legal, Internal Audit and the Chief Risk Office.
>
> The Management Executive Committee, which is chaired by the Chief Executive Officer and composed of principal executive officers of the company, has responsibility for reviewing and approving our enterprise-wide risk tolerance policy and our enterprise-wide risk framework, addressing issues referred to it by our risk

committees, addressing matters that involve multiple types of risks and addressing other significant business and reputational risks. Where appropriate, the Management Executive Committee brings transactions of an extraordinary nature and significant potential new business activities to the Risk Policy and Capital Committee of the Board of Directors, as well as other relevant committees, if necessary, for review and approval.

174.    Fannie Mae also stated on its 2005 10-K:

We have worked to enhance our credit analytics and data to better understand, assess and price for the risks associated with these products to allow us to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types.

175.    On August 16, 2007, Fannie Mae filed its 10-K for 2006.  The 2006 10-K was signed by, among others, Ashley and Mudd.  With respect to risk management, the 10-K filing stated:

Effective management of risks is an integral part of our business and critical to our safety and soundness.

*       *       *

Our corporate risk framework is intended to ensure that people and processes are organized in a way that promotes a cross-functional approach to risk management and that controls are in place to better manage our risks.  Basic tenets of our corporate risk framework include:

- Establishing corporate-wide policies for risk management,
- Delegating to business units primary responsibility for the management of day-to-day risks inherent in the activities of the business unit,
- Enacting policies and procedures designed to ensure that we have an independent risk oversight function with appropriate checks and balances throughout our company; and
- Monitoring aggregate risks and compliance with risk policies at a corporate level.

176.    Also on the 2006 10-K, Fannie Mae stated:

We believe that our approach to management of credit risk during the past several years has contributed to our maintenance of a credit book with strong credit characteristics overall, as measured by loan-to-value ratios, credit scores and other loan characteristics that reflect the effectiveness of our credit risk management strategy.

47

177.    With respect to Single-Family Business, Fannie Mae's 2006 10-K boasted:

Our conventionally single-family mortgage credit book of business remained relatively strong from 2004-2006.  We believe that our assessment and approach to the management of credit risk during these years allowed us to maintain a conventional single-family mortgage credit book of business with strong credit risk characteristics as evidenced by our credit losses, which remained low during the three-year period from 2004-2006.

*        *        *

We continue to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types.  Our assessment of these dynamics will continue to determine the timing and level of our acquisitions of these types of mortgage products…

178.    Fannie Mae's 2006 10-K filing went on to state:

**Capital Markets Group**

The Capital Markets group continues to seek ways to maximize long-term total returns while fulfilling our chartered liquidity function.

*        *        *

In an effort to gain better returns, we have acquired new products for which we have been attractively compensated for the risk assumed.  We will continue to seek out these beneficial opportunities in the future.

179.    Fannie Mae's 2006 10-K also remarked on its credit risk management:

**Credit Risk Management**

We are generally subject to two types of credit risk:  mortgage credit risk and institutional counterparty credit risk.  The degree of credit risk to which we are exposed will vary based on many factors, including the risk profile of the borrower or counterparty, the contractual terms of the agreement, the amount of the transaction, repayment sources, the availability and quality of collateral and other factors relevant to current market conditions, events and expectations.  We evaluate these factors and actively manage, on an aggregate basis, the extent and nature of credit risk we bear, with the objective of ensuring that we are adequately compensated for the credit risk we take, consistent with our mission goals.

180.     The 2006 annual filing also stated:

**Acquisition Policy and Standards**

We use proprietary models and analytical tools to price and measure credit risk at acquisition.  Our loan underwriting and eligibility guidelines are intended to provide a comprehensive analysis of borrowers and mortgage loans based upon known risk characteristics.  The underwriting of single-family mortgage loans primarily focuses on an evaluation of the borrower's creditworthiness and ability to repay the loan based on the value of the property and LTV ratio, the loan purpose and the loan product features…Our guidelines for both types of loans require a comprehensive analysis of the property value, the LTV ratio, the local market, and the borrower and their investment in the property.

181.     The 2006 10-K signed by Mudd and Ashley, also stated with respect to risk management:

**Chief Risk Office**

The Chief Risk Office is an independent risk oversight organization with responsibility for oversight of credit risk, market risk, operational risk and liquidity risk.  The Chief Risk Officer is responsible for establishing our overall risk governance structure and providing independent evaluation and oversight of our risk management activities.  In 2006 and 2007, we centralized oversight of our business continuity efforts, information security programs, corporate insurance program and SOX Finance Team under our Operational Risk oversight function within the Chief Risk Office to further strengthen our existing operational risk programs…

182.     The above statements filed in the 2006 10-K were untrue because Fannie Mae significantly reduced the Chief Risk Officer's budget and staff as can be seen from the e-mails described above between Dallavecchia and Mudd.

183.     The Officer Defendants making the false statements never corrected the statements before Plaintiff's purchase of the Fannie Mae securities.

184.     All Officer Defendants knew or should have known that Fannie Mae was concealing the truth about its risk controls.  Yet, none of the Officer Defendants revealed the truth prior to the time Plaintiff purchased the Fannie Mae securities.

185.     On September 20, 2007, Mudd stated in a Congressional hearing before the House Committee on Oversight and Government Reform that Fannie Mae could provide more help to the home finance market without taking risks the company was not capable of managing and that Fannie Mae had "vastly reduced material control weaknesses."

186.     Fannie Mae filed its 2007 10-K on February 27, 2008 which was signed by, among others, Ashley, Mudd, and Swad.  With respect to risk management, Fannie Mae's filing stated:

> Our risk governance framework, which is approved by our Board of Directors, is designed to balance strong corporate oversight with well-defined independent risk management functions within each business unit. The objective of our corporate risk framework is to ensure that people and processes are organized in a way that promotes a cross-functional approach to risk management and that controls are in place to better manage our risks and comply with legal and regulatory requirements.

> Senior managers of each business unit are responsible and accountable for identifying, measuring and managing key risks within their business consistent with corporate policies. Management-level credit, market, liquidity and operational risk committees provide oversight of the business units and are responsible for establishing risk tolerance policies, monitoring performance against our risk management strategies and risk limits, and identifying and assessing potential issues. We also have a Chief Risk Office that is responsible for establishing our overall risk governance structure and providing independent evaluation and oversight of our risk management activities. Our Board of Directors, through the Risk Policy and Capital Committee, provides additional risk management oversight.

> Our Internal Audit group provides an objective assessment of the design and execution of our internal control system, including our management systems, our risk governance, and our policies and procedures. Our Office of Compliance and Ethics is responsible for overseeing our compliance activities and coordinating our OFHEO and HUD regulatory reporting and examinations; and managing our data privacy and anti-fraud efforts.

187.     On a conference call on February 27, 2008, Mudd stated, "First, we are taking steps to protect our business from the risks that are apparent in this extraordinary market."  He also stated with respect to the company's risk, "On credit, we're taking additional steps to protect the book by controlling our risk and our losses."

188.     Although Fannie Mae continued to reassure investors that the company's risk was being monitored, in fact Fannie Mae ignored warnings of risks during a failing market and invested in subprime and Alt-A mortgages.  Even when other institutions were leaving the subprime and Alt-A market, Fannie Mae continued to invest in risky loans.

189.     These representations in the 2007 10-K and in the conference call on February 27, 2008 were materially false and misleading because Fannie Mae did not maintain adequate internal risk controls particularly with respect to the vast amount of risk it took on in the failing market.

190.     Fannie Mae gave investors false security.   Contrary to what Fannie Mae represented to the public, Fannie Mae dove into risky investments without the proper risk controls.

191.     Mudd went on to say on the February 27, 2008 conference call:

So as you can see by doing the math there, ***there's about $13 billion above the statutory requirement***.  The 30% OFHEO requirement was put in place against those uncertainties from the restatement in '01 to '04.  As I noted, I think we worked diligently and in very good cooperation with OFHEO to address all of those 81 remediation items, embodied, certainly in the 10-K, in the clean socks opinion.  And as you know, OFHEO made a statement today and we really welcome and appreciate director Lockhart's comments, which I think lay a path for us to move through the consent order, but through that, ***to continue to manage the capital very conservatively, given the uncertainties in a troubled market.  So we'll conserve capital***.  We will – we will continue those discussions to access the capital that is there above the – above the statutory minimum, and I think us being able to apply that capital to both sides of the equation I talked about, fulfilling our role as a guarantor and insurer and in an environment that's taking losses but at the same time, to be able to provide liquidity to a market that really needs it, you know, is in really everybody's interest right now.  I'm pleased that we are moving that direction.

(Emphasis added)

192.     On November 9, 2007, Fannie Mae issued a press release entitled "Fannie Mae Files 2007 Quarterly Reports with the SEC – Company Returns to Current Financial Reporting" wherein Mudd stated:

During the last year, we vastly reduced our material weaknesses in internal controls, expanded our risk-management functions, reduced our headcount, and cut our operating expenses.  The Company is in solid shape to support the market, and is in better shape to benefit when the market correction ends.

(Emphasis added)

193.    Fannie Mae issued a press release in December 2007 regarding the issue of new preferred shares stating:

This financing will provide the company with additional capital to conservatively manage increased risk in the housing and credit markets, help meet its mission of providing affordability, liquidity and stability, and free up capital to pursue emerging growth opportunities.

194.    The statements by Mudd on the February 27, 2007 conference call, the press release on November 9, 2007 and the December 2007 press release were all false and misleading as can be seen from the emails described above from Dallavecchia to Mudd from 2006 through 2007 concerning Fannie Mae's risk controls.

## G. The Materially False and Misleading Offering Circular

195.    The Offering Circular, dated May 13, 2008, offered the Preferred Stock at a sales price of $25 per share.  The issue date was May 19, 2008, and the New York Stock Exchange symbol for the issue was "FNMprT."[75]  The Offering Circular provided that Fannie Mae would issue 80,000,000 shares of the Preferred Stock, which would raise a total $2 billion.  Of this amount, $63 million was allocated to the underwriters for fees, although the amount could be as low as $53 million if the entire issue was sold to institutional investors.  In any event, the Underwriter Defendants benefited substantially in acting as underwriters for the Preferred Stock.

196.    The Offering Circular was prepared and reviewed by both Officer Defendants and Underwriter Defendants.   On information and belief, each Officer Defendant and each

---

[75] The Preferred Stock was never listed on the New York Stock Exchange as represented in the Offering Documents.

Underwriter Defendant had actual knowledge that the Offering Circular misrepresented Fannie Mae's true financial condition.

197.    The names of the Underwriter Defendants appear on the cover-page (the first page) of the Offering Documents.  Citgroup and Wachovia Securities are listed as the Joint Book-Running Managers.

198.    Wachovia Securities purchased a portion of the Preferred Stock and, in turn, sold a portion of these to Plaintiff.

199.    Prior to the offering date, a salesman/dealer from Wachovia Securities made a solicitation phone call to Plaintiff.  Wachovia Securities knew that Plaintiff was interested in purchasing conservative, income-producing preferred stock.   On May 13, 2008, Plaintiff purchased 600,000 shares of the Preferred Stock (CUSIP 313586737) from Wachovia Securities, pursuant to the Offering Circular, for $15 million.

200.    The materially deceptive representations and omissions do not stem merely from the Offering Circular's generalized statements concerning prospective risks.   Rather, the Offering Circular contained material misrepresentations and omissions concerning past performance and the then-current financial condition of Fannie Mae.  In particular, the Offering Circular represented that Fannie Mae had an adequate capital base to withstand the coming financial storm which was materially false. In short, the misrepresentation and omission concerning Fannie Mae's then-current financial health had the effect of improperly concealing prospective risks.

201.    The Offering Circular summarized, and incorporated by reference, Fannie Mae's most recent 10K and 10Q filings, including its statement concerning its capitalization.  The Offering Circular misrepresented risks by regurgitating Fannie Mae's previous statements

concerning $17.8 billion in deferred tax assets, which were still being carried at full value.  The Officer and Underwriter Defendants, via the Offering Circular, reassured investors that, under current conditions, it was appropriate to carry these tax benefits as part of Fannie Mae's capital base:

> We must evaluate our ability to realize the tax benefits associated with our deferred tax assets quarterly.  In the future, we may be required to record a material expense to establish a valuation allowance against our deferred tax assets, which like would materially adversely affect our earnings, financial condition and capital position.

202.    The Offering Circular represented that Fannie Mae's core capital, as of March 31, 2008, was $42.7 billion.  In the Offering Circular, Defendants alleged that Fannie Mae's core capital exceeded the statutory minimum capital requirement by $11.3 billion.  Defendants further alleged that the capital base exceeded the statutory minimum capital requirement plus the 20% OFHEO-directed capital surplus requirement by $5.1 billion.  However, the capital help by Fannie Mae without the deferred tax assets would have only been $24.876 billion, which would be $12.726 billion below the OFHEO-directed capital surplus requirement.

203.    According to the Offering Circular, "to ensure compliance with each of our regulatory capital requirements, we [Fannie Mae] maintain different levels of capital surplus for each capital requirement."  Further, "as a consequence, we generally seek to maintain a larger surplus over the risk-based capital requirement to ensure continued compliance" and "we target a surplus above the statutory minimum capital requirement and OFHEO-directed minimum capital requirement to accommodate a wide range of possible valuation changes that might adversely impact our core capital base."

204.    The Offering Circular's representations concerning Fannie Mae's core capital and total capital were grossly inflated as the truth came out about Fannie Mae's use of deferred tax

assets.  A substantial part of Fannie Mae's assets were the full face value of deferred tax assets without any write-down.

205.    In addition, by the end of 2007, Fannie Mae was holding about $74 billion in Alt-A and subprime loans in its portfolio, but had written down only $4.6 billion, again showing that the Offering Circular contained misinformation.

## V.
## UNDERWRITER DEFENDANTS

206.    The Underwriter Defendants' responsibilities included pricing and selling the Preferred Stock. To price the Preferred Stock appropriately, Underwriter Defendants were required to perform adequate due diligence in order to gain an understanding of Fannie Mae's operations and financial condition and to gain an understanding of the mortgage market.

207.    The Underwriter Defendants also participated in drafting the Offering Circular for the Preferred Stock and understood that potential investors expected them to perform adequate due diligence to test whether the representations made in those documents were accurate and not misleading.   Importantly, the Underwriter Defendants knew that Fannie Mae's regulator, OFHEO, had previously determined that Fannie had "manipulated accounting,"[76]   The Underwriter Defendants should have been on heightened alert when performing their due diligence of Fannie Mae.

208.    In connection with the Preferred Stock, the Underwriter Defendants represented to potential investors that Fannie Mae was raising additional capital to provide it with a cushion to ensure compliance -- even in difficult economic conditions -- not only with the minimum statutory capital requirement, but also with the OFHEO-mandated minimum capital requirements. The Offering Circular states:

---

[76] OFHEO Report: Fannie Mae Façade – May 23, 2006, *available at* http://www.fhfa.gov/webfiles/2095/52306fnmserelease.pdf

> While we are able to reasonably estimate the size of our book of business and therefore our minimum capital requirement, the amount of our reported core capital holdings at each period end is less certain. Changes in the fair value of our derivatives may result in significant fluctuations in our capital holdings from period to period. Accordingly, we target a surplus above the statutory minimum capital requirement and OFHEO-directed minimum capital requirement to accommodate a wide range of possible valuation changes that might adversely impact our core capital base.

*Offering Circular*, Preferred Series T, at 38.

209.   In connection with the Preferred Stock, the Underwriter Defendants represented to the Plaintiffs that as of March 31, 2008, Fannie Mae's core capital exceeded the statutory minimum requirement by $11.3 billion and exceeded the OFHEO-directed minimum capital requirement by $1 billion. *Offering Circular* at 4.

210.   These statements were material because the Underwriter Defendants were representing that the OFHEO-directed minimum capital was sufficient.

211.   The Underwriter Defendants, however, knew that Fannie Mae had purchased and held hundreds of billions of dollars of subprime and Alt-A mortgages and mortgage-backed securities. Each Underwriter Defendant also knew that a relatively small impairment of these mortgages and mortgage-backed securities could wipe out the OFHEO-directed minimum capital of Fannie Mae.  Moreover, each Underwriter Defendant knew that investors like Plaintiff would rely on the representations made with respect to Fannie Mae's capital requirements in deciding whether to purchase the preferred stock.

212.   The Underwriter Defendants were aware of Fannie Mae's shifting business model and its increasing exposure to the high-risk mortgage market. The Underwriter Defendants participated in numerous Fannie Mae offerings and thereby had a keen understanding of Fannie Mae's business practices. The Underwriter Defendant's prior experience with Fannie Mae, and access to view Fannie Mae's internal procedures, gave the Underwriter Defendants superior non-

public knowledge of Fannie Mae's business, accounting practices, risk exposure, and true financial condition.

213.     By May 2008, as the Underwriter Defendants were selling the Preferred Stock, the Underwriter Defendants were well aware that residential mortgage-backed securities had suffered significant declines in value.   Prior to the Offering Circular, the Underwriter Defendants[77] announced negative quarterly results and billions of dollars in losses related to impaired mortgage-backed assets. Nonetheless, even as these Underwriter Defendants were themselves writing down the values of mortgage backed securities on their own balance sheets, they did not insist that Fannie Mae do the same or disclose that the value of its mortgage backed securities was overstated prior to the Offering Circular.

214.     The Underwriter Defendants possessed independent knowledge of the risks associated with mortgage backed securities given their sophisticated participation in the mortgage markets at the time of the Offering Circular. As a result of the Underwriter Defendants' extensive business operations in the residential mortgage market, the Underwriter Defendants were knowledgeable of, among other things (i) industry standards within the mortgage lending industry, including underwriting and appraisal requirements; (ii) standard representations and warranties provided by loan originators to purchasers in the secondary market; and (iii) the market for mortgage backed securities.

215.     The Offering Circular failed to warn investors that, because of new accounting rules, there was a risk that Fannie Mae would not be able to meet certain minimum capital requirements imposed on it by its regulator, the OFHEO.  This constituted a material omission and all Underwriter Defendants had actual knowledge that the material omission made the Offering Circular misleading and deceptive.

---

[77] And/or affiliated entities.

216.     According to a Brookings Institute study, "Prime mortgages dropped to 64 percent of the total in 2004, 56 percent in 2005 and 52 percent in 2006."[78]  Citigroup, and Wachovia Securities, which bought and sold such mortgages in large quantities, were aware of the decreasing quality of mortgages and the challenges this posed to risk management.

217.     Revelations concerning Citigroup provide an example of how Citigroup, and all the other Underwriter Defendants, knowingly sold defective mortgages to Fannie Mae but failed to disclose the material risks associated with such mortgages in the Offering Circular.

218.     The U.S. Securities and Exchange Commission and Congress had been investigating Citigroup for failing to adequately disclose its own subprime exposure.  Thus Citigroup knew the importance of performing due diligence on Fannie Mae's subprime exposure.

219.     The Financial Crisis Inquiry Commission, created by statute (Public Law 111-21), issued its report (the "Report") in January 2011.  The evidence disclosed in the Report proves that Citigroup knew adverse information about Fannie Mae which should have been included in the Offering Circular.

220.     At Citigroup, Richard Bowen, a veteran banker in the consumer lending group, received a promotion in early 2006 when he was named business chief underwriter.  His new job was to oversee loan quality for over $90 billion a year of mortgages underwritten and purchased by CitiFinancial.

221.     The Report quotes Bowen as saying that these mortgages were then sold to Fannie Mae, Freddie Mac and others.

---

[78]  Brookings Institute Study: The Origins of the Financial Crisis – November 2008, available at http://www.brookings.edu/~/media/Files/rc/papers/2008/11_origins_crisis_baily_litan/11_origins_crisis_baily_litan. pdf

222.     In June 2006, Bowen discovered that as much of 60% of the loans that Citi was buying – and then selling in part to Fannie Mae – were defective.  That is, they did not meet Citigroup's loan guidelines.[79]

223.     Bowen told the Financial Crisis Inquiry Commission that he tried to alert top managers at the firm by "email, weekly reports, committee presentations and discussions"; but though they expressed concern, "it never translated into action."[80]

224.     Bowen finally took his warnings to the highest level of management – Robert Rubin, the chairman of the Executive Committee of the Board of Directors and three other bank officials.  The Report describes how Bowen sent Rubin and the three other banking officials a memo concerning the defective loans with the words, "URGENT – READ IMMEDIATELY."

225.     The transcript of Bowen's testimony, from a Commission Hearing conducted on April 7, 2010, was released in conjunction with the Financial Crisis Inquiry Commission's Report.  Bowen testified that, in addition to sending warnings in the form of e-mail, weekly reports, committee presentations and discussions, "I even requested a specific investigation from management that was in charge of internal controls.  And that investigation confirmed that we had very serious problems."[81]

226.     According to Bowen, "I continued my warnings through 2007.  But Citigroup continued to purchase and sell even more mortgages in 2007."  Bowen noted that the portion of defective mortgages sold to Fannie Mae, Freddie Mac and other investors rose from 60% in 2006 to over 80% in 2007.[82]  None of this information, known to Citigroup and important to investors, was reflected in the Offering Circular.

---

[79] FCIC Report, pg. 19.
[80] Id.
[81] FCIC Report, pg. 79.
[82] Id.

227.    Bowen told the Financial Crisis Inquiry Commission that after repeatedly alerting higher management concerning poor loan quality, he went from supervising 220 people to supervising only two people, his bonus was reduced and he was downgraded in his performance review.

228.    Citigroup failed to add a warning in the Offering Circular concerning the defective nature of loans in Fannie Mae's inventory and Fannie Mae's poor risk controls concerning the mortgages it purchased.

229.    Citigroup was not the only Underwriter Defendant with knowledge of statements and omissions in the Offering Circular which made the Offering Circular deceptive and misleading.   Other facts, some unearthed by the Financial Crisis Inquiry Commission, demonstrate that each Underwriting Defendant knew of Fannie Mae's improper accounting and improper risk control.

230.    In testifying before the Financial Crisis Inquiry Commission, John Kerr, the FHFA examiner in charge of the Fannie Mae's examination, minced no words.   He labeled Fannie Mae "the worst-run financial institution" he had seen in his 30 years as a bank regulator.[83]

231.    Scott Smith, the associate director at FHFA after that agency replaced OFHEO, concurred with Kerr.   Smith and Kerr both noted Fannie Mae's "weak forecasting models, which included hundreds of market simulations but scarcely any that contemplated declines in house prices."[84]

---

[83] FCIC Report, pg. 321.
[84] FCIC Report, pg. 322.

232.    According to Austin Kelly, an OFHEO specialist, there was no relying on Fannie's numbers, because their "processes were a bowl of spaghetti."[85]

233.    The Report also notes, "Kerr and a colleague said that they were struck that Fannie Mae, a multi-trillion-dollar company, employed unsophisticated technology; it was less tech-savvy than the average community bank."

234.    What Kerr, Smith and Kelly found at Fannie Mae bears no relationship to the Underwriter Defendants' description of Fannie Mae in the Offering Circular.

235.    On March 8, 2008 White House economist Jason Thomas sent to Treasury official Robert Steel an email with an alarming analysis:  it claimed that in reporting its 2007 financial results, Fannie Mae was masking its insolvency through fraudulent accounting practices.   This email and its attachment – a 12-page analysis – were released by the Financial Crisis Inquiry Commission.  The summary section of this analysis stated:

> ***Any realistic assessment of Fannie Mae's capital position would show the company is currently insolvent.***  Accounting fraud has resulted in several asset categories (non-agency securities, deferred tax assets, low-income partnership investments) being overstated, while the guarantee obligations liability is understated.   These accounting shenanigans add up to tens of billions of exaggerated net worth.

> Yet, the impact of a tsunami of mortgage defaults has yet to run through Fannie's income statement and further annihilate its capital.  Such grim results are a logical consequence of Fannie's dual mandate to serve the housing market while maximizing shareholder returns.  In trying to do both, Fannie has done neither well.  With shareholder capital depleted, a government seizure of the company is inevitable.

(Emphasis added)

236.    The 12-page document provides an analysis of each of the problems identified.

237.    The first section discusses and demonstrates that Fannie's reported Core Capital overstates its true core value.

---

[85] FCIC Report, pg. 322

238.    The next section is titled "Reported GAAP Equity and Fair Value Overstates Economic Reality."  Subsections discuss non-agency securities, guarantee obligations, deferred tax assets, and low income housing and explain how Fannie's accounting in these four areas was improper.  "Fannie is obliviously not acknowledging market expectations nearly as much as Freddie."

239.    Next is a section titled "Credit Costs Will Spiral Out of Control" predicting Fannie Mae's demise because "Fannie Mae's unrealistic optimism about its prospects" has resulted in inappropriate valuations of it claimed assets.

240.    After discussing problems associated with Fannie Mae's dual mandate – to serve the housing market while maximizing shareholder returns – the analysis concludes with a section titled "Government Bailout is Necessary, Likely, And Potentially Helpful."

241.    Unlike Plaintiff, the Underwriting Defendants had access to Fannie's books, records and employees, but failed to provide adequate disclosure of the serious problems noted in the 12-page analysis.

242.    One possible reason the Underwriter Defendants decided to conceal Fannie's problems may be found in a July 7, 2010 Forbes article titled "How Fannie and Freddie Unloaded Their Trash."  In the article, Professor Seth Lipner questioned why any broker would be willing to underwrite an offering for a business with risky mortgages; a broker who was told the business was lacking in controls; a broker who was informed about the business's inability to manage risk, and a business that showed desperation to raise capital to avoid regulatory sanction.

243.    So, why were Citigroup, and Wachovia Securities willing to promote mortgage-related underwritings?  According to the professor Lipner:  "Fees.  Big underwriting fees.  Over one-third of a billion dollars in fees between November 2007 and June 2008."

244.     At the time of the Offering, all Underwriter Defendants knew that careful due diligence was required because of the prevailing financial conditions, and conditions in the mortgage markets in particular.   These Underwriter Defendants knew that collateralized debt obligation spreads jumped between July 2005 and July 2007.   For home-equity loan asset-back securities, the spreads on AAA-rated tranches were barely perceptible in early 2007, but thereafter quickly rose.

245.     At the time of the Offering Circular, the Underwriter Defendants were already suffering losses from their own poor risk controls.   Knowing of their own poor risk controls (and sales of defective mortgages to Fannie Mae), each Underwriter Defendant had learned the need for due diligence to detect risk management problems.

246.     Each Underwriter Defendant decided it wanted the fee income from the Preferred Stock more than it felt the need to tell the truth to the Plaintiff.

## VI.
## OFFICER DEFENDANTS' SCIENTER

247.     Because of their positions in Fannie Mae's hierarchy, the Officer Defendants received adverse information about Fannie Mae's financial condition and concealed such information from the public.   Each knew, consciously disregarded, was reckless and grossly negligent in not knowing, and/or otherwise should have known, that it was wrong and illegal to conceal this information about Fannie Mae from the public.   Throughout the relevant period, each of the Officer Defendants participated in the issuance of false and misleading statements concerning the operations of Fannie Mae, including misleading press releases, and SEC filings, and participated in the approval of other materially deceptive statements made to the press, securities analysts, and Fannie Mae shareholders.

248. In short, each Officer Defendant misrepresented facts to the public and omitted material information when approving SEC filings and during conference calls with analysts and investors.

249. Internal emails admit that Fannie Mae did not have the proper resources to monitor and control risk; however, Fannie Mae and the Officer Defendants continuously represented to the public that they were monitoring and controlling Fannie Mae's risk.

250. Mudd was Fannie Mae's President and Chief Executive Officer from June 2005 to September 7, 2008; Vice Chairman of the Board from February 2000 to June 2005; Interim Chief Executive Officer from December 2004 to June 2005; and Chief Operating Officer from February 2000 to December 2004.

251. Levin was Fannie Mae's Executive Vice President and Chief Business Officer from November 2005 to September 7, 2008; Interim Chief Financial Officer from December 2004 to January 2006; Executive Vice President of Housing and Community Development from June 1998 to December 2004; and Executive Vice President-Marketing from June 1990 to June 1998.

252. Swad was Fannie Mae's Executive Vice President from May 2007 to September 7, 2008 and was CFO from August 2007 to September 7, 2008.

253. Dallavecchia was Fannie Mae's Chief Risk Officer from July 2006 through January 2009. Further, Dallavecchia sent multiple emails to other Fannie Mae executives acknowledging Fannie Mae's lack of appropriate risk controls.

254. Each Officer Defendant knew the circumstances surrounding Fannie Mae's business practices and financial position. In various reports, press conferences and other public statements, Officer Defendants made material misrepresentations and/or failed to disclose

material information regarding the financial stability provided by Fannie Mae's capital base and Fannie Mae's risk management practices.

255.    Fannie Mae's Officer Defendants made deceptive statements to the public and Fannie Mae's investors that the company had excess capital and superior risk management practices.

256.    Mudd, Levin and Swad signed 10-Qs and/or 10-Ks attesting to their knowledge and obligation to honestly disclose Fannie Mae's controls and procedures, as defined in Exchange Act rules 13a-15(e) and 15d-15(E).  Each Officer Defendant, however, misrepresented Fannie Mae's internal controls and misrepresented Fannie Mae's true financial condition.

257.    Emails to Mudd and the signatures of all Officer Defendants on the 10-Qs and/or 10-Ks acknowledging a series of losses, evidence each Officer Defendant's knowledge of Fannie Mae's exposure to the failing market and its lack of sufficient capital.  However, the Officer Defendants continually reassured the public affirmatively and unequivocally stating that Fannie Mae had sufficient capital and was in a position to, not just overcome, but to in fact profit during the rough economic circumstances surrounding the real estate and mortgage markets.

258.    The real estate and mortgage markets began a tremendous downturn in 2007.  The mortgage market began to experience a surge in mortgage loan defaults because of the proliferation of high-risk mortgage loans.  Throughout this accelerating decline in the mortgage market, the Officer Defendants continued to state  that Fannie Mae was conservatively managing its capital, was employing risk management controls and had well in excess of the minimum capital requirements.

259.    Despite seeing the warning signs and knowing the unfavorable market conditions, the Officer Defendants steadfastly refused to disclose the inadequacy of Fannie Mae's capital

base.  Instead, they fraudulently hid the truth by the inclusion in the capital base of tax deferred assets.

A.    **Mudd**

260.    Mudd repeatedly misled investors by painting a glowing picture of Fannie Mae's financial condition in the company's 10-Ks and 10-Qs and in repeated statements in conference calls on February 27, 2007, November 9, 2007, February 27, 2008, and May 6, 2008.  He knew that the filings and statements contained material misrepresentations regarding Fannie Mae's risk controls, asset valuation, risk exposure to the non-prime mortgage market and its capital and liquidity all of which impacted Fannie Mae's reported capital base and earnings.

261.    These material misrepresentations were intentionally made.  For example, mere months before Fannie Mae's conservatorship, when Mudd was well aware of Fannie Mae's lack of capital, Mudd stated that Fannie Mae "is in solid shape to support the market, and is in better shape to benefit when the market correction ends."[86]

262.    Mudd assured investors that Fannie Mae was well above both the statutory and OFHEO minimum requirements for core capital and stated that Fannie Mae continued to manage its capital account "very conservatively."  Yet within a few short months after making these statements, Fannie Mae finally acknowledged in its second quarter results for 2008 that it might not be able to "recover our deferred-tax assets."  Mudd was aware that Fannie Mae had suffered a series of quarterly losses and would most likely not realize the deferred tax assets that comprised a substantial portion of Fannie Mae's reported capital but refused to tell Plaintiffs.

263.    It wasn't until after the government placed Fannie Mae in conservatorship, that Fannie Mae wrote down over $20 billion in deferred assets.

---

[86] *Fannie Mae Files 2007 Quarterly Reports with the SEC – Company Returns to Current Financial Reporting*, Press Release from Fannie Mae, November 9, 2007.

264.     On March 15, 2011, the NEW YORK TIMES reported that Mudd had received a "Wells notice" from the SEC and that another former Fannie Mae executive was expected to receive one on as well.

265.     A Wells notice is an indication that the agency is considering an enforcement action.

**B.     Levin**

266.     Defendant Levin misled investors in his portrayal of Fannie Mae's financial condition in the company's 10-Ks and 10-Qs and in public statements.  He knew that the filings and statements contained material misrepresentations regarding Fannie Mae's risk controls, asset valuation, risk exposure to the non-prime mortgage market and its capital and liquidity all of which impacted Fannie Mae's reported capital base and earnings.

267.     The misrepresentations made by Levin were intentional. In a February 27, 2008 conference call, Levin, despite knowing of the problems in the non-prime mortgage market and Fannie Mae's inadequate risk management and insufficient capital base, told investors that the company was managing its capital conservatively.  He further stated in that same conference call that "[o]ur operating philosophy for capital is to manage it to protect ourselves against market scenarios more adverse than we expect."

268.     However, Levin was aware that Fannie Mae's capital base consisted in large part of intangible assets that could not be used in a period of crisis.

269.     As Executive Vice President and Chief Business Officer, Levin knew of the misrepresentations made in SEC filings and by various Fannie Mae officers and directors but did nothing to correct those misrepresentations or filings.

C.      Swad

270.    Swad misled investors in his portrayal of Fannie Mae's financial condition in the company's 10-Ks and 10-Qs and in public statements.  He knew that the filings and statements contained material misrepresentations regarding Fannie Mae's risk controls, asset valuation, risk exposure to the non-prime mortgage market and its capital and liquidity all of which impacted Fannie Mae's reported capital base and earnings.

271.    The misrepresentations made by Swad were intentional. In a November 9, 2007 conference call, Swad, despite knowing of the problems in the non-prime mortgage market and Fannie Mae's inadequate risk management and insufficient capital base, told investors that Fannie Mae's capital was in excess of its requirements and that Fannie Mae believed "we can make investments and earn returns well above our cost of capital."  Again, in a February 27, 2008 conference call, Swad reiterated to investors that Fannie Mae had well in excess of its capital requirements.  In truth, Swad knew that Fannie Mae had included billions in deferred assets in its capital base which, if properly reported, would have placed the company well below its minimum capital requirements.

272.    As Executive Vice President and CFO, Swad was primarily responsible for managing Fannie Mae's financial risks as well as being responsible for financial planning, financial record-keeping, and financial reporting for Fannie Mae and was aware of the misrepresentations made in SEC filings and by various Fannie Mae officers and directors but did nothing to correct those misrepresentations or filings.

D. Dallavecchia

273.    Dallavecchia was Executive Vice President and Chief Risk Officer until August 2008. In his role as Chief Risk Officer, Dallavecchia chaired the Allowance for Loan Losses

Oversight Committee, which reviewed and approved the methodology and the amount of Fannie

Mae's allowance for loan losses and reserve for guaranty losses (combined loss reserves) on a

quarterly basis. In addition, as Chief Risk Officer, Dallavecchia had an oversight role regarding

credit, market, operational and liquidity risks. Among other things, Dallavecchia warned Mudd

that Fannie Mae's risk management systems were inadequate. Dallavecchia made a number of

false and misleading statements in conference calls prior to the Offering Circular.

274.    On February 27, 2007, Fannie Mae conducted a conference call with investors.

On the call, Dallavecchia represented that, to the extent it invested in subprime and Alt-A loans,

Fannie did so carefully and with the benefit of strong risk controls:

> [W]e have increased our participation in subprime product in 2006. **Our purchases have been prudent** and have been made when we concluded that they would contribute to our mission objectives or they would generate a profitable return. . . . [W]e participate in the subprime market in accordance with parameters that were agreed between my team and the business leaders. These parameters were developed to carefully calibrate exposure to layered risk, for example, the exposure to the combination of high loan-to-value duration and stated accommodation. . . . [W]e have acquired subprime loans from selected lender partners **whose underwriting practices and standards we reviewed**. . . . I believe that our activity in the subprime market represents **an appropriate and prudent engagement** in a segment that has been important to the housing market in this country. . . . I would advise that you consider our exposure in light of **the strength of the risk characteristics** I have described and **the immaterial size of our participation in the subprime market**.
>
> *     *     *
>
> I think **from a control and risk underwriting standpoint, we want to continue maintaining prudent underwriting standards**. One thing that we always look very carefully to is the layering of the risk, not that all subprime loans are bad, but there's some conditions where all the risks are layered one on top of the other, which makes the risk higher. And we want to make sure that we understand the risk and we are remunerated for it.

275.     On November 9, 2007, Fannie Mae conducted a conference call with analysts in which Dallavecchia made the following misrepresentations as to Fannie's exposure to subprime mortgages:

> Our subprime exposure is composed basically of two large buckets, one bucket which are the PLS securities. We talk about that; we have talked about the fact that they are conforming loans, then they have over a 30% subordination and an average maturity of two years. So I won't spend more time on that. The remaining part bucket, which is really the loans that we own which are subprime loans, and that is about $7 billion of that. On those, I would point out to you that a good 55% are fixed-rate and that most of them have – are a principal residence so they are not loans that we believe are owned by investors. At least that's what our underwriting has told us. For those loans, even in a worse market, the price drops. I think that we're going to have losses but ***it's very difficult to infer large losses for the whole company just based on how the subprime, the very small amount of subprime loans that we have***, how the effect would be on everyone.

276.     These statements were misrepresentations as can be seen from the dire warnings Dallavecchia had previously sounded in his internal October 2006 email to Mudd regarding Fannie Mae's inability to assess and manage the risks of subprime loans.

## VII.
## LOSS CAUSATION

277.     As detailed herein, Defendants engaged in a scheme to artificially inflate the value of the Preferred Stock by misrepresenting Fannie Mae's business success and future prospects, including but not limited to, misrepresentations regarding its risk exposure to subprime mortgage loans, obtained over the objection of senior risk officers, its capital adequacy, its risk-assessment ability, and its financial reporting.

278.     As a result of the fraudulent conduct alleged herein, the Preferred Stock was artificially inflated. When Plaintiff purchased the Preferred Stock its true value was substantially lower than the price actually paid.

279.     The false and misleading statements set forth above were widely disseminated to the securities markets, investment analysts, and to the investing public. Those statements caused and maintained the artificial inflation of the price of the Preferred Stock, which consequently traded at prices in excess of their true value. Partial disclosures of Fannie Mae's true condition concerning its exposure (in terms of both volume and quality) to non-prime and non-traditional loans, the state of capital availability, and the company's lack of ability and/or willingness to control and manage risk, caused the price of the Preferred Stock to decline, eliminating a portion of the inflation in the price. This decline in value caused Plaintiff economic harm.

280.     By misrepresenting the success of Fannie Mae's risk exposure, underwriting and capital adequacy, as well as its ability to control risk, Defendants presented a misleading picture of Fannie Mae's business and prospects. For example, often-repeated statements by Fannie Mae executives that its non-prime exposure was limited and that the quality of those loans was similar to Fannie Mae's conventional book of business caused and maintained the artificial inflation in the price of the Preferred Stock even as negative news reached the market, until the truth was finally revealed in 2008.

281.     Plaintiff relied to its detriment on Defendants' materially false and misleading statements in purchasing the Preferred Stock at artificially inflated prices. Had Plaintiff known the truth, it would not have purchased the Preferred Stock.

282.     As explained herein, the false statements directly or proximately caused, or were a substantial contributing cause of, the damages and economic loss suffered by Plaintiff, and maintained the artificial inflation in the price of the Preferred Stock until the truth was revealed to the market.

283.     Plaintiff relied upon Fannie Mae's misrepresentations.  Plaintiff also relied upon the misstatements and material omissions of all Defendants as this was part of the mix of information Plaintiff considered in the decision to purchase the Preferred Stock.

284.     In July 2008, the first of a series of partial disclosures revealing Fannie Mae's core capital inadequacy emerged. On Thursday, July 10, 2008, before the market opened, *Bloomberg* published an article entitled, "Fannie, Freddie 'Insolvent' After Losses, Poole Says (Update1)." The article quoted former St. Louis Federal Reserve President, William Poole: "Congress ought to recognize that [Fannie Mae and Freddie Mac] are insolvent."

285.     News about Fannie Mae's capital inadequacy continued to emerge on July 11, 2008. On that date, *The New York Times* published an article warning that the federal government was weighing a takeover of Fannie Mae.

286.     On September 7, 2008, the FHFA issued a statement announcing that it had placed Freddie Mac into conservatorship.

287.     The disclosures of Fannie Mae's true condition concerning its true risk exposure and severe capital inadequacy caused the price of the Preferred Stock to plummet. The decline in value caused Plaintiff economic harm.

## VIII.
## <u>CAUSES OF ACTION</u>

288.     Plaintiff incorporates by reference all proceeding paragraphs, as relevant, into each cause of action.

289.     Plaintiff also pleads that the principle of tolling laid out by the U.S. Supreme Court applies, as relevant, to each cause of action.  *See American Pipeline & Construction Co. v. Utah,* 414 U.S. 538 (1974).

A.      **Statutory Fraud**

290.    Fannie Mae, Officer Defendants, and the Underwriter Defendants violated the Texas Fraud in Real Estate and Stock Transactions statute, section 27.01 of the Texas Business & Commerce Code.

291.    Fannie Mae, Officer Defendants and Underwriter Defendants made false statements of past and existing fact, and concealed material adverse information about Fannie Mae's risk-management operations and financial condition, for the purpose of inducing Plaintiff and other investors to purchase the Preferred Stock in violation of the Texas Fraud in Real Estate and Stock Transactions.

292.    The Offering Circular, devised and approved by Fannie Mae, Officer Defendants and the Underwriter Defendants contained untrue statements about Fannie Mae's financial health.  The Offering Circular omitted material adverse information about Fannie Mae which, if disclosed in May 2008, would have been important to, and would have materially affected, Plaintiff's decision to purchase the Preferred Stock.

293.    In short, the Offering Circular for the Preferred Stock was materially false and misleading because it concealed the absence of adequate risk controls, failed to reveal Fannie Mae's significant exposure to the subprime market, materially overstated Fannie Mae's capital base and inaccurately reported tax-deferred assets.  Each Defendant knew of Fannie Mae's false statements but decided to conceal rather than reveal them.

1.      **Primary Violations of Statutory Fraud**

294.    Fannie Mae, Officer Defendants and each Underwriter Defendant made false representations of past or existing facts that were (1) made to induce Plaintiff into purchasing the Preferred Stock and (2) were relied upon by Plaintiff.

295.     The sole purpose of the Offering Circular was to entice Plaintiff and other investors to purchase the Preferred Stock by means of statements that falsely stated Fannie Mae's financial condition and concealed Fannie Mae inability to management risks associated with the mortgages Fannie Mae purchased.   Wachovia Securities, in particular, solicited Plaintiff by telephone and transmitted the false information to Plaintiff.

296.     Plaintiff relied upon the false representations by Fannie Mae, Officer Defendants and the Underwriter Defendants in making their purchase of Preferred Stock. Fannie Mae, Officer Defendants and each Underwriter Defendant are accordingly liable to Plaintiff for actual damages, reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions and costs of court under sections 27.01(b) and (e). Additionally, Fannie Mae is liable for exemplary damages under section 27.01(c).

### 2.     Statutory Fraud Aiding & Abetting

297.     In addition or in the alternative, Fannie Mae and each Officer Defendant and each Underwriter Defendant violated section 27.01(d) of the Texas fraud statute.

298.     Fannie Mae, and the Officer Defendants, as primary violator, made false representations of past and existing material fact in its SEC filings and in the Offering Circular. Fannie Mae and the Officer Defendants authorized and filed the Offering Circular, a document prepared for the sole purpose of inducing Plaintiff and other investors to purchase the initial offering of the Preferred Stock.

299.     Fannie Mae and each Officer Defendant and Underwriter Defendants (1) had actual knowledge of the falsity of representations made by Fannie Mae; (2) failed to disclose the falsity of the representations; and (3) benefited from the false representations.

300.     Fannie Mae and each Officer Defendant and Underwriter Defendant had actual knowledge that the glowing description of Fannie Mae's financial condition, portrayed by the Fannie Mae financial statements and various other statements incorporated in the Offering Circular, were false and misleading.

301.     Actual awareness may be inferred where objective manifestations indicate a person acted with actual awareness.  The conduct described in detail *supra* shows, and creates the inference of, actual knowledge of material misrepresentations and omissions in the Offering Circular by Fannie Mae and each Officer Defendant and each Underwriter Defendant.

302.     None of the Defendants in this action disclosed the falsity of Fannie Mae's financial statements or other false statements (including material omissions) to Plaintiff and other potential investors.

303.     Each Officer Defendant benefitted by keeping his job longer that would otherwise have been the case and by their substantial compensation packages (for example, Mudd's 2007 total compensation from Fannie Mae in 2007 was $12,217,500; Dallavecchia even received $321,707 in his agreement with Fannie Mae to end his association with Fannie Mae).  Each Underwriter Defendant benefitted by receiving a portion of the $53-63 million dollars in fees Fannie Mae paid them for underwriting the Preferred Stock.  Fannie Mae also benefited by the proceeds of Plaintiff's investment.

304.     Fannie Mae and each Officer Defendant and each Underwriter Defendant, therefore, is liable pursuant to section 27.01(d) of the Texas Business & Commerce Code.

305.     As a result of violating section 27.01(d), Fannie Mae and each Officer Defendant and each Underwriter Defendant is liable to Plaintiff for actual damages, exemplary damages,

reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court as provided in sections 27.01(d) and (e).

**B.      Texas Securities Act**

**1.      Primary Violations of the Texas Security Act**

306.     Defendants Wachovia Securities and Fannie Mae each violated Texas Revised Civil Statute article 581-33A(2).

307.     Wachovia Securities and Fannie Mae sold or issued the Preferred Stock to Plaintiff by means of untrue statements of material fact and/or omissions of material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

308.     Fannie Mae was the "issuer" under the Texas Securities Act.

309.     Wachovia Securities purchased the shares from Fannie Mae.  Next, Wachovia Securities solicited Plaintiff and sold Plaintiff part of the initial offering of Preferred Stock. Wachovia Securities was, therefore, a "seller" of the initial offering under the Texas Securities Act.

310.     Wachovia Securities offered and sold to Plaintiff the Preferred Stock by means of untrue statements of material fact and the omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

311.     The Offering Circular, as discussed at length *supra,* contained material misrepresentations, including by means of omission.

312.     Plaintiff was unaware of the material untruths.

313.     Wachovia Securities and Fannie Mae are liable to Plaintiff for damages, including attorneys' fees and costs, as specified in article 581-33D.

### 2.     Texas Securities Act Control Persons

314.     In addition or in the alternative, each Officer Defendant violated article 581-33F(1) of the Texas Securities Act.

315.     Fannie Mae was the issuer of the Preferred Stock purchased by Plaintiff.

316.     Each Officer Defendant was, and acted as, a controlling person of Fannie Mae within the meaning of article 581-22F(1).  Each Officer Defendant had direct involvement in the day-to-day operations of Fannie Mae.  Each Officer Defendant was provided with or had access to Fannie Mae's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

317.     Each Officer Defendant was in a position of power and control within the Fannie Mae hierarchy.  With respect to various transactions and financial statements specified *supra,* each Officer Defendant had the power to influence and control, and did directly or indirectly influence and control, Fannie Mae's decision-making processes.  Each also made or approved of public representations or omissions of material fact concerning Fannie Mae's financial health.

318.     As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of the Preferred Stock.  Each Officer Defendant is therefore liable to Plaintiff pursuant to Texas Securities Act article 581-33F(1) for damages, including costs and attorneys' fees as specified in article 581-33D.

### 3.      Texas Securities Act Aiding & Abetting

319.     In addition or in the alternative, Dallavecchia, Mudd and the Underwriter Defendants violated article 581-33F(2) of the Texas Securities Act.

320.     Fannie Mae was the issuer of the Preferred Stock purchased by Plaintiff.  Fannie Mae's 2007 10-K and 2008 First Quarter 10-Q were materially false and deceptive.

321.     Dallavecchia and Mudd directly and indirectly, with intent to deceive or defraud or with reckless disregard for the truth and or the law, materially aided Fannie Mae's misstatements of material fact, and/or omission of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

322.     Dallavecchia and Mudd knew, or acted with reckless disregard for the truth in not knowing, that Fannie Mae misrepresented its financial condition in filings with the Securities and Exchange Commission and in the Offering Circular.

323.     Dallavecchia and Mudd, as detailed *supra,* aided and abetted the fraud by making false and misleading statements about Fannie Mae's financial condition.

324.     Dallavecchia and Mudd knew the truth prior to Plaintiff's purchase of the Preferred Stock but did not reveal it.

325.     Dallavecchia and Mudd both had knowledge regarding, or recklessly disregarded, Fannie Mae's true financial condition.

326.     Dallavecchia and Mudd failed to correct Fannie Mae's misrepresentations prior to Plaintiff's purchase of the Preferred Stock. Even after Plaintiff's purchase of Preferred Stock, neither Dallavecchia nor Defendant Mudd informed Plaintiff of the misrepresentations and material omissions.

327.     As explained in detail *supra*, Fannie Mae, with material assistance from Dallavecchia and Mudd, made or omitted to make statements material to Plaintiff's investment decision with reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of the Preferred Stock.   To a reader of the Offering Circular in May 2008, Fannie Mae appeared to be a well capitalized concern seeking to raise additional capital to pursue reasonable business opportunities.

328.     As discussed, *supra,* the Underwriter Defendants aided and abetted Fannie Mae by misrepresentations of Fannie Mae's financial condition and omission of material facts.   By signing off on the Offering Documents, and with knowledge of the untruths in the Offering Documents, the Underwriter Defendants made or omitted to make statements material to Plaintiff's investment decision with reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of Preferred Stock.

329.     In reality, and as later recognized by Director James Lockhart of the OFHEO, at the time of the offering, Fannie Mae was not sufficiently capitalized, even though its balance sheet reflected a strong capital base.

330.     In reality, Fannie Mae had inadequate risk controls, yet was cutting the resources available to the department responsible for evaluating risk.

331.     Information released after Plaintiff's purchase of the Preferred Stock revealed Fannie Mae's exposure to the subprime debacle which dramatically increased the risk involved and the need for additional capital.   The heart of the problem was wholly inadequate risk controls; this information, however, was concealed with the aid of Dallavecchia, Mudd, and the Underwriter Defendants.

332.     Dallavecchia, Mudd, and the Underwriter Defendants knew, or were extremely reckless in not knowing, that the Offering Circular materially misrepresented the risks associated with investing in Fannie Mae.

333.     Dallavecchia, Mudd, and the Underwriter Defendants are liable because they each (1) knew, or were legally obligated to know, that Fannie Mae's statements were false and misleading at the time they were made; and (2) both materially aided Fannie Mae by helping Fannie Mae conceal its true financial condition.

334.     Plaintiff would not have purchased the Preferred Stock if the true financial health of Fannie Mae had been accurately stated in public statements, in SEC filings and in the Offering Circular.

335.     As a direct and proximate result of conduct by Dallavecchia, Mudd, and the Underwriter Defendants that aided and abetted Fannie Mae, Plaintiff suffered damages.

## C.      Common Law Fraud

336.     In addition or in the alternative, Fannie Mae, Dallavecchia and Mudd are liable to Plaintiff for common law fraud.

337.     Fannie Mae, Dallavecchia and Mudd made false and misleading statements and/or material omissions of fact to Plaintiff in connection with its purchase of Fannie Mae securities.

338.     Fannie Mae, Dallavecchia and Mudd knew the representations were false at the time they were made.

339.     Such statements of fact were material to Plaintiff in its decision to purchase the Preferred Stock.

340.     Plaintiff reasonably relied upon Fannie Mae, Dallavecchia and Mudd's materially false and misleading misrepresentations and/or material omissions of fact.

341.     Defendants Fannie Mae, Dallavecchia and Mudd intended that Plaintiff and other investors would act on the misrepresentations and purchase the Preferred Stock.

342.     Plaintiff was damaged as a result of Fannie Mae, Dallavecchia and Mudd's materially false and misleading statements and/or material omissions of fact.   Fannie Mae, Dallavecchia and Mudd are liable to Plaintiff.

**D.     Negligent Misrepresentation**

343.     Fannie Mae, Officer Defendants and each Underwriter Defendant negligently misrepresented Fannie Mae's financial condition.

344.     As detailed *supra*, Fannie Mae, each Officer Defendant and each Underwriter Defendant made false and misleading statements and/or material omissions of fact to Plaintiff in connection with its purchase of the Preferred Stock.

345.     Fannie Mae, the Officer Defendants and the Underwriter Defendants owed Plaintiff the duty to ensure any such statements they made were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

346.     Fannie Mae and the Officer Defendants made such misrepresentations and omissions in SEC filings and in the Offering Circular, and public pronouncements pursuant to which Plaintiff purchased the Preferred Stock.

347.     The Underwriter Defendants made such misrepresentations and omissions in the Offering Circular pursuant to which Plaintiff purchased the Preferred Stock.

348.     The material misstatements of fact were made to Plaintiff with the intent that Plaintiff and other investors would rely on them.

349.     Plaintiff reasonably and justifiably relied upon Fannie Mae's, the Officer Defendants' and the Underwriter Defendants' materially false and misleading misrepresentations and/or material omissions of fact.

350.     Defendant Fannie Mae, the Officer Defendants and the Underwriter Defendants knew, and in the exercise of reasonable care should have known, that their representations were false.

351.     Plaintiff was in the limited class of persons Fannie Mae, the Officer Defendants and Underwriter Defendants knew would be potential purchasers of Preferred Stock.

352.     Plaintiff was damaged as a result of Defendant Fannie Mae's, each Officer Defendant's and Underwriter Defendants' materially false and misleading statements and/or material omissions of fact.

### E.     Violation of Section 10(b) of the Exchange Act

353.     In addition or in the alternative, Fannie Mae, Mudd and Dallavecchia are liable for violations of section 10(b) of the Exchange Act and its corresponding regulation, Rule 10b-5.

354.     Fannie Mae, and Mudd and Dallavecchia are liable for making false and misleading statements, or failing to disclose material adverse facts and acting directly as a participant in a scheme and/or course of business which: (i) deceived the investing public, including Plaintiff, regarding Fannie Mae, its business, products, and prospects; (ii) artificially inflated the market price of the Preferred Stock; and (iii) caused Plaintiff to purchase the Preferred Stock at inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, each Officer Defendant took the actions set forth *supra*.

355.    Fannie Mae, Mudd and Dallavecchia's direct participation includes the presentation and/or review of Fannie Mae's false and/or misleading SEC filings, registration statements, Offering Circular, press releases, and/or conference calls.

356.    Fannie Mae, Mudd and Dallavecchia had a duty to disseminate accurate and truthful information promptly with regard to Fannie Mae's operations, financial condition, and performance so that the market prices of Fannie Mae's securities would be based on truthful, complete and accurate information. Additionally, Fannie Mae, Mudd and Dallavecchia each had a duty to correct any previously issued statements that had become untrue, or were discovered to be untrue, and to disclose any adverse trends known to them that would materially affect Fannie Mae's operating results. Mudd and Dallavecchia's duties are specified, in part, by the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X 17 and S-K[87] and other SEC regulations.

357.    Fannie Mae, Mudd and Dallavecchia violated Section 10(b) of the Exchange Act and Rule 10b-5, as pled with specificity in this complaint, because each (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made not misleading; or (c) engaged in acts, practices and a course of business which operated as a fraud or deceit upon Plaintiff in connection with its purchases of the Preferred Stock.

358.    Despite knowledge of Fannie Mae's false and misleading statements, Mudd and Dallavecchia failed to disclose material adverse facts about the financial condition and business prospects of Fannie Mae, which caused the SEC filings, registration statements, Offering Circular, press releases and other public statements to be materially false and misleading as

---

[87] 17 C.F.R. § 210.01 *et. seq.* and 17 C.F.R. 229-10 *et. seq.*, respectively.

specified with particularity *supra*. Mudd and Dallavecchia directly and indirectly, knowingly engaged and participated in a fraudulent scheme and course of conduct to conceal adverse material information about the business, finances, financial condition, and future business prospects of Fannie Mae.

359. Mudd and Dallavecchia's primary liability arises from the fact that: (i) Mudd and Dallavecchia were high-level executives and/or director of Fannie Mae; (ii) Mudd and Dallavecchia, by virtue of their responsibilities and activities as a senior executive officer and/or director of Fannie Mae, was privy to, and participated in, the creation, development and reporting of Fannie Mae's internal budgets, plans, projections and/or reports; (iii) Mudd and Dallavecchia had familiarity with each other and were advised of and had access to other members of Fannie Mae's management teams, internal reports, and other data and information about Fannie Mae's financial condition and performance at all relevant times; and (iv) Mudd and Dallavecchia were aware of Fannie Mae's dissemination of information to the investing public that he knew was materially false and misleading or for which he recklessly disregarded the truth.

360. Plaintiff, at the time of the misrepresentations and omissions, was ignorant of the falsity of the statements and believed them to be true. Plaintiff relied upon these misrepresentations, on the integrity of the market, on the securities offering process and on the fidelity, integrity and superior knowledge of the Officer Defendants. Plaintiff, in ignorance of the true condition of Fannie Mae, was induced to purchase and did purchase the Preferred Stock. Had Plaintiff known the truth, it would not have bought the Preferred Stock at the offering price.

361. Mudd, Dallavecchia and Fannie Mae are liable to Plaintiff for their section 10(b) violation.

### F.     Violation of Section 20(a) of the Exchange Act

362.     In addition or in the alternative, Mudd and Dallavecchia violated Section 20(a) of the Exchange Act and are liable to the Plaintiff.  Mudd and Dallavecchia were, and acted as, a controlling person of Fannie Mae within the meaning of Section 20(a) of the Exchange Act.

363.     Mudd and Dallavecchia had direct involvement in the day-to-day operations of Fannie Mae and with respect to the transactions at issue.  Mudd and Dallavecchia had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Fannie Mae, including the content and dissemination of the various false and misleading statements.  Mudd and Dallavecchia were provided with and/or had access to copies of Fannie Mae's reports, press releases, public filings, and other statements prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

364.     Mudd and Dallavecchia also had information, internally generated by Fannie Mae, which warned each Officer Defendant about Fannie Mae's true prospects.

365.     By reason of such wrongful conduct, Mudd and Dallavecchia are liable to Plaintiff pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, Plaintiff suffered damages in connection with its purchases of Fannie Mae securities.

# X.
## <u>PRAYER</u>

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor and against Defendants as follows:

          a.        Actual damages, including all direct, consequential, and special damages;

          b.        All equitable relief to which they may be entitled;

          c.        The rescission of Plaintiff's purchase;

          d.        Pre-judgment interest as provided by law;

          e.        Punitive damages as provided by statutory and common law;

          f.        Attorneys' fees and legal expenses (including expert fees);

          g.        Post-judgment interest; and

          h.        Costs of Court;

Plaintiff further prays for any other monetary or equitable relief to which it may be entitled.  Plaintiff respectfully demands a trial by jury.

        Respectfully submitted,

        By:        /s/ Andrew Frisch        .
        **The Law Office of Andrew J. Frisch**
        **Andrew J. Frisch**
        950 Third Avenue, 15th Floor
        New York, New York 10022
        (212) 784-2413
        (212) 888-0919 facsimile
        afrisch@andrewfrisch.com

        **GREER, HERZ & ADAMS, L.L.P.**
        **Andrew J. Mytelka**
        **Attorney-in-Charge**
        S.D. Texas Federal I.D. No. 11084
        State Bar No. 14767700
        **Joe A.C. Fulcher**
        S.D. Texas Federal I.D. No. 14126
        State Bar No. 07509320

**Steve Windsor**
S.D. Texas Federal I.D. No. 13558
State Bar No. 21760650
**Eric J. Kirkpatrick**
S.D. Texas Federal I.D. No. 500364
State Bar No. 24031215
**Laura Englert**
S.D. Texas Federal I.D. No. 990973
State Bar No.  24055135
One Moody Plaza, 18th Floor
Galveston, Texas  77550
(409) 797-3200 (Telephone)
(409) 766-6424 (Facsimile)
**ATTORNEYS FOR PLAINTIFF,
COMPREHENSIVE INVESTMENT
SERVICES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel for the parties.

_____/s/ Andrew Frisch_____
**The Law Office of Andrew J. Frisch
Andrew J. Frisch**
950 Third Avenue, 15th Floor
New York, New York 10022
(212) 784-2413
(212) 888-0919 facsimile
afrisch@andrewfrisch.com